160 F.3d 858
 78 Fair Empl.Prac.Cas. (BNA) 988,
75 Empl. Prac. Dec. P 45,762
Christine M. GIERLINGER, Plaintiff-Appellant-Cross-Appellee,
v.
John GLEASON, Defendant-Appellee-Cross-Appellant.
 Docket Nos. 97-7917, 97-7947.
 United States Court of Appeals,
Second Circuit.
 Argued May 21, 1998.
Decided Nov. 5, 1998.
 
 Willard M. Pottle, Jr., Buffalo, New York, for Plaintiff-Appellant-Cross-Appellee.
 Michael S. Buskus, Assistant Attorney General, Albany, New York (Dennis C. Vacco, Attorney General of the State of New York, Peter H. Schiff, Deputy Solicitor General, Peter G. Crary, Assistant Attorney General, Albany, New York, on the brief), for Defendant-Appellee-Cross-Appellant.
 Before: MESKILL and KEARSE, Circuit Judges, and TELESCA, District Judge* .
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiff Christine M. Gierlinger, following a jury verdict in her favor in the United States District Court for the Western District of New York, John T. Elfvin, Judge, was awarded $117,739 in damages against defendant John Gleason, a major and troop commander in the New York State Police ("NYSP"), on her claim under 42 U.S.C. § 1983 for the termination of her employment as a NYSP trooper in retaliation for her complaints of sexual harassment. Gierlinger appeals from so much of a postjudgment order as denied her motion for prejudgment interest and certain costs, and denied in part her request for attorneys' fees, limiting that award to $104,949. Gleason cross-appeals, contending that the trial evidence entitles him to judgment as a matter of law or, alternatively, that errors in the district court's evidentiary rulings and jury instructions entitle him to a new trial. For the reasons that follow, we reject Gleason's contentions; we find merit in Gierlinger's challenges to the rulings on prejudgment interest and attorneys' fees; and we remand for further proceedings.
 
 I. BACKGROUND
 
 2
 These appeals follow the third trial of Gierlinger's claims. At the first trial in 1992, a jury found Gleason liable to Gierlinger in the amount of $340,000. As discussed in greater detail in Part III.B.5. below, the judgment was vacated on appeal because of errors in the manner in which the case was submitted to the jury. See Gierlinger v. New York State Police, 15 F.3d 32 (2d Cir.1994) ("Gierlinger I "). The second trial, begun in 1994, ended in a mistrial that was declared by the district judge sua sponte. The facts set out below are taken from the evidence presented at the third trial, held in 1996, viewed in the light most favorable to Gierlinger, against whom judgment is sought as a matter of law.
 
 
 3
 A. The Circumstances of Gierlinger's Employment
 
 
 4
 Gierlinger began duty as a probationary trooper in NYSP in March 1987, and after six months of training at the NYSP academy, was assigned in September 1987 to the NYSP station in Wellsville, New York. Wellsville was in "zone 4" of NYSP "Troop A." Falconer, New York, a station to which Gierlinger was later transferred, was in "zone 3" of NYSP Troop A. At all pertinent times, Gleason was the Troop A commander.
 
 
 5
 On the night of December 2, 1987, Gierlinger arrived at work in Wellsville to find that the uniforms she kept in her locker at the station had been vandalized. The NYSP emblems on her shirts had been ripped off; and three pairs of her uniform trousers had been slit--two of them in the crotch. She reported the incident to a sergeant at the Wellsville station, who passed her complaint up the chain of command. She also reported the incident to a sergeant in NYSP's affirmative action office.
 
 
 6
 On December 5, Gleason was informed of the complaint and since he "felt that [the complaint], in all probability, would come under the definition or classification of sexual harassment" (Transcript of Third Trial ("Third Trial Tr."), Aug. 19, 1996, at 550), he ordered Lieutenant Charles J. McCole, the zone commander for zone 4, to conduct an investigation. A few days later, NYSP headquarters took charge of the investigation, and eventually Staff Inspector Joseph M. Abate was assigned to investigate Gierlinger's complaints.
 
 
 7
 Abate investigated not only Gierlinger's complaints of the events of December 2 but also her complaints of other incidents, such as food being placed in her mail folder, her locker being overturned, and the lock on her locker being suffused with Super Glue. As a result of his investigations into these complaints, Abate concluded, in reports dated February 1 and 12, 1988, respectively, that the events of which Gierlinger complained had in fact occurred. However, the perpetrators of most of the incidents were never identified, and Abate's reports concluded that the events did not constitute sexual harassment.
 
 
 8
 In the meantime, on December 5, 1987, the day Gleason was informed of Gierlinger's complaints and instructed McCole to investigate, McCole met with Gierlinger to continue an evaluation session begun during the prior month and told Gierlinger, "at length," that "[h]er attitude and judgment ... were not satisfactory." (Memorandum from McCole to Troop A Commander [Gleason] re "First Monthly Conference," dated December 8, 1987, at 2.) McCole also sent Gleason a memorandum reporting that during the December 5 conversation with Gierlinger, she complained that one trooper had said after an argument with her that "no woman could talk to him in that manner," and that another trooper had been "picking on her because of her gender." (Memorandum from McCole to Troop A Commander re "Trooper Christine Gierlinger" dated December 8, 1987, at 2.)
 
 
 9
 Contemporaneously, because Gierlinger was scheduled to be transferred from the Wellsville station to the Falconer station, an additional evaluation of her was prepared. That evaluation, in which McCole also participated, gave Gierlinger an overall rating of "Needs Improvement" and singled out for criticism her "attitude" and her "judgment." (NYSP Transfer Performance Evaluation dated December 8, 1987, at 1-2.) Two days later, Gleason sent a memorandum to NYSP headquarters, stating that
 
 
 10
 Trooper Gierlinger has been counselled relative to her attitude and judgment. Specifically, she has been ordered to refrain from having her husband visit her while at work; leaving her issue baton with a defendant and also to refrain from confronting her supervisors when given constructive criticism. In addition, she is currently involved in a sexual harassment complaint in which she alleges that other members [of NYSP] assigned to SP Wellsville have harassed her.
 
 
 11
 (Memorandum from Gleason to Deputy Superintendent Jerome L. O'Grady dated December 10, 1987.)
 
 
 12
 During Abate's investigation of Gierlinger's complaint about the damage to her uniforms, Gierlinger stated that another female trooper in Troop A had been subjected to sexual harassment. Gleason was ordered to investigate that allegation. Accordingly, Gleason interviewed Gierlinger on January 27, 1988. At that interview, Gierlinger declined to describe any harassment of others, but she told Gleason that she personally had been sexually harassed on several occasions. Sometime thereafter, Abate informed Gleason that Gierlinger had complained to an NYSP affirmative action officer about the January 27 meeting. She complained that Gleason had been disrespectful to her, had been unreceptive to her complaints, and, seemingly indifferent to the sensitive subject matter, had conducted the interview within earshot of other NYSP employees.
 
 
 13
 Following his January 27 meeting with Gierlinger, Gleason launched several investigations into Gierlinger's own conduct. Two were commenced on February 1, 1988. One involved an allegation that on January 17 Gierlinger had allowed her husband, who was not a member of NYSP, to enter restricted areas of an NYSP station. The other involved Gierlinger's use of sick leave and was based on information--learned more than a month earlier from casual sources--that Gierlinger was spending time with her husband at his job. On February 11, 1988, Gleason ordered three more investigations into Gierlinger's conduct. One involved a complaint that Gierlinger had failed to comply with orders directing her to submit memoranda explaining instances of tardiness and altered time records. Another investigation involved a complaint that Gierlinger had abandoned her post at the station desk, refused to return to the desk when ordered to return, and demonstrated disrespect to a superior officer. At the conclusion of this investigation, Gleason wrote a memorandum to NYSP headquarters, stating "I have determined that the penalties I can impose as Troop Commander are not sufficient in this matter. Recommend appropriate disciplinary action be commenced at the [headquarters] level." (Memorandum from Gleason to Chief Inspector Francis A. DeFrancesco dated March 1, 1988, at 2.)
 
 
 14
 The third February 11 investigation involved a New York State Thruway toll supervisor's complaint that Gierlinger, while driving her NYSP vehicle, had failed to pay the required toll. That investigation included taking a statement from the toll supervisor. The toll supervisor testified at trial that she had held that position for nine years and that, during that period, she had made complaints several times each year about NYSP troopers' failures to pay tolls. But the only such instance in which she had ever been asked to give a statement was the incident involving Gierlinger.
 
 B. Gierlinger's Termination
 
 15
 As each probationary trooper nears the end of the one-year term of probation, his or her supervisors are required to prepare an "eleventh-month" evaluation and to recommend whether the probationer's employment should be continued beyond the probationary period. On March 4, 1988, Gierlinger was presented with her "eleventh-month" evaluation, prepared by Sergeant Gary W. Rowe, the acting zone commander for zone 3 of Troop A, where Gierlinger then worked. Gierlinger's eleventh-month evaluation gave her an overall rating of "Needs Improvement." Rowe sent the evaluation to Gleason, along with the required recommendation, stating as follows:
 
 
 16
 Trooper GIERLINGER has difficulty obeying orders and directives and has on occasion interpreted them in a way that was to her benefit....
 
 
 17
 Trooper GIERLINGER attempts to circumvent authority when she disagrees with something by approaching a higher supervisor and discussing the matter after she has already been given specific instructions by another supervisor.
 
 
 18
 Rather than accept constructive criticism as a learning process, Trooper GIERLINGER takes the attitude that supervisors are an adversary [sic ] that "pick" on her.
 
 
 19
 (Memorandum from Rowe to Troop A Commander, dated March 3, 1988, at 1.) After recounting the conclusions of several of the investigations that Gleason had ordered into Gierlinger's conduct, Rowe concluded that "Trooper GIERLINGER'S attitude and conduct is [sic ] disruptive to the efficient operation of the Station and has an adverse affect [sic ] on the overall morale," and he recommended that Gierlinger not be retained as a trooper. (Id. at 2.)
 
 
 20
 Gleason was required to make his own recommendation as to whether or not Gierlinger should be retained at the end of her probationary period. On March 4, he recommended that Gierlinger "be terminated prior to the expiration of her probationary period." (Memorandum from Gleason to Deputy Superintendent Joseph J. Strojnowski dated March 4, 1988, at 5 (emphasis added).) Gleason's memorandum detailed four of the personnel investigations he had ordered, which had resulted in recommendations that Gierlinger be disciplined, and stated that Gierlinger "interprets every interaction to be a personal assault upon her and refuses to accept responsibility for compliance to [NYSP] Rules and Regulations." (Id. at 4.) Gleason noted that as a result of Gierlinger's complaints, NYSP headquarters conducted "a lengthy investigation involving sexual harassment by other [NYSP] members towards her." (Id. at 2.) The memorandum concluded:
 
 
 21
 Trooper GIERLINGER has actively displayed an attitude indicative of noncompliance and challenging authority of supervisory personnel.... It is felt that the continued employment of Trooper GIERLINGER would result in the needless and wasted efforts of supervisory personnel in addressing frivolous and unfounded complaints on her part. Additionally, Trooper GIERLINGER has demonstrated an inability to adapt to the semi-military structure of the [NYSP] and it is highly unlikely that she ever will.
 
 
 22
 (Id. at 5.) This memorandum was sent to NYSP headquarters along with, inter alia, the recommendation of acting zone commander Rowe, the eleventh-month evaluation, and the reports produced as a result of each of the four investigations mentioned in Gleason's memorandum.
 
 
 23
 Gleason's March 4 memorandum and the accompanying materials were reviewed at NYSP headquarters by Deputy Superintendent Jerome L. O'Grady. In a five-page memorandum detailing Gierlinger's negative performance evaluations and the results of several of the investigations Gleason had ordered, O'Grady recommended to the NYSP superintendent, who had final decisionmaking authority over Gierlinger's employment, that Gierlinger not be retained. The superintendent accepted that recommendation. On March 17, 1988, Gleason informed Gierlinger of her termination.
 
 
 24
 C. The Pretrial Proceedings and the First Two Trials
 
 
 25
 In June 1989, Gierlinger commenced the present action for violation of her rights under federal and state law. Initially naming only NYSP as a defendant, the complaint was brought principally under 42 U.S.C. § 1983, alleging violation of Gierlinger's rights to due process and equal protection, and under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), It sought, inter alia, compensatory and punitive damages on the grounds that Gierlinger's employment had been terminated because of her gender and in retaliation for having complained of sexual harassment. The complaint was amended three days later to add 13 individual defendants, including McCole, Abate, Rowe, and Gleason.
 
 
 26
 Defendants moved to dismiss parts of the first amended complaint on various grounds. NYSP moved to dismiss all but the Title VII claim against it, arguing that on the other claims it was entitled to Eleventh Amendment immunity. On the same ground, the other defendants moved to dismiss the claims asserted against them in their official capacities. And all defendants moved to dismiss the claims for compensatory and punitive damages on Gierlinger's claims under Title VII on the ground that that statute authorized only equitable relief. The individual defendants also argued that the first amended complaint was insufficiently specific as to the culpable conduct Gierlinger wished to attribute to each individual:
 
 
 27
 The complaint alleges, for example, that the defendants' termination of the plaintiff: was made without notice or without personal interview; was without opportunity for a hearing; was arbitrary; was done because of the plaintiff's sex; and was done to punish the plaintiff for prior complaints....
 
 
 28
 The requirement that specific facts be alleged in section 1983 cases is especially important where, as here, there are several defendants named in the complaint. It is beyond reason to believe, even assuming some factual basis for the plaintiff's claims, that each defendant was responsible for all of the wrongs of which the plaintiff complains.
 
 
 29
 (Defendants' Memorandum of Law in Support of Motion To Dismiss, dated January 12, 1990, at 7.) Defendants' motion concluded that
 
 
 30
 the only claims which should remain before the Court, and the defendants should be required to answer, [are] claims made pursuant to Title VII seeking relief authorized by that statute, and claims made pursuant to § 1983 against the individual defendants in their individual capacities only.
 
 
 31
 (Id. at 10-11.) The district court granted defendants' motions and gave Gierlinger leave to file a new complaint.
 
 
 32
 Represented by new counsel, her original attorney having left private practice, Gierlinger filed a second amended complaint in August 1990. This new complaint differed little from the first amended complaint except to omit requests for punitive damages on three of the five asserted claims, to identify NYSP as an employer within the meaning of Title VII, and to include summaries of the conduct of which Gierlinger accused each individual defendant.
 
 
 33
 After discovery, Gierlinger's claims against four of the individual defendants were dismissed on consent. In addition, at some point in time that remains unclear on the record before us, NYSP was eliminated from the case. In May 1992, the case proceeded to trial against nine individual defendants. At the close of Gierlinger's evidence, the district court granted judgment as a matter of law to four of those defendants, leaving the jury to decide her claims against five defendants, including Gleason. The jury returned a verdict in favor of all of the remaining defendants except Gleason. The jury found Gleason liable to Gierlinger for damages totaling $340,000.
 
 
 34
 Gleason appealed, contending (1) that he was entitled to judgment in his favor as a matter of law, and (2) that there was error in the court's instructions to the jury. As discussed in Part III.B.5. below, we agreed with his second contention, and we vacated the judgment against Gleason and remanded for a new trial of the claims against him.
 
 
 35
 In July 1994, the district court began the second trial of Gierlinger's claims against Gleason. On the ninth day of that trial, the court sua sponte declared a mistrial. As discussed in Part III.B.2. below, the reason given by the court was principally that the trial had gotten out of control.
 
 
 36
 In ordering the mistrial, Judge Elfvin volunteered that he would recuse himself from the case so that the third trial would be conducted before a different judge. When several months had passed without the entry of an order of recusal, Gierlinger made a motion for recusal. Judge Elfvin denied the motion.
 
 D. The Third Trial
 
 37
 The third trial was begun before Judge Elfvin in August 1996. Before that trial, this Court decided Tomka v. Seiler Corp., 66 F.3d 1295 (2d Cir.1995), ruling that "individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII," id. at 1313. Accordingly, Gierlinger's Title VII claim against Gleason was dismissed, leaving her with claims under § 1983 and state law for denial of equal protection and intentional infliction of emotional distress.
 
 
 38
 At the third trial, the parties presented evidence as described in Parts I.A. and I.B. above. After the close of the evidence, the district court concluded that there was insufficient evidence to support Gierlinger's claim of gender discrimination, and it submitted to the jury only her claims for retaliation and emotional distress. The court gave the jury a special verdict form that included the following questions:
 
 
 39
 1. Do you find that the plaintiff has proven by the preponderance of the evidence that the defendant intentionally retaliated against her in violation of her Constitutional rights for, among any other reasons, her having made a complaint or complaints of sexual harassment?
 
 
 40
 2. If you answered "Yes" to Question 1, do you find that the defendant has proven by the preponderance of the evidence that he would have taken the same action for non-discriminatory reasons?
 
 
 41
 3. If you answered "Yes" to Question 1 and "No" to Question 2, do you find that the plaintiff has proven (by a preponderance of the evidence) that the defendant's act was a proximate cause of any injuries and consequent damages suffered by the plaintiff?
 
 
 42
 The jury returned a verdict in favor of Gierlinger, answering "Yes" to the first question, "No" to the second, and "Yes" to the third. The special verdict form asked the jury to determine the extent, if any, of Gierlinger's "financial damages for loss of past and future income." (Court Exhibit 1 filed September 6, 1996, at 2.) The jury's response was $117,738. The jury also awarded Gierlinger one dollar as damages for "the defendant's infliction upon her of emotional distress." (Id.)
 
 E. The Posttrial Proceedings
 
 43
 Following the entry of judgment, Gleason filed a motion "for an order pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure granting a new trial in this action on the grounds that the [district c]ourt committed error in its evidentiary rulings [and] in instructing the jury." (Gleason Notice of Motion dated September 13, 1996.) In a Memorandum and Order dated June 26, 1997 ("Posttrial Order"), the district court denied Gleason's motion. See Part II below.
 
 
 44
 Gierlinger filed two posttrial motions, seeking awards of prejudgment interest, costs, and attorneys' fees. In its Posttrial Order, the court denied Gierlinger's motion for prejudgment interest see Part III.A. below, and costs, and denied in part her motion for attorneys' fees, see Part III.B. below.
 
 F. The Present Appeals
 
 45
 Gierlinger has appealed from so much of the Posttrial Order as denied her motions for prejudgment interest, costs, and attorney's fees, contending principally that the district court's rulings were based on erroneous standards. Gleason has cross-appealed, contending, inter alia, that he is entitled to judgment as a matter of law because the evidence at the third trial compelled the jury to find that, regardless of any retaliatory actions by Gleason, Gierlinger would not have been retained by NYSP beyond the one-year probationary period. Alternatively, Gleason contends that he is entitled to a new trial because of errors in the trial court's evidentiary rulings and instructions to the jury. Because Gleason's contentions, if meritorious, would render the issues raised by Gierlinger moot, we address the cross-appeal first.
 
 II. GLEASON'S CHALLENGES TO THE JUDGMENT
 
 46
 In his cross-appeal, Gleason contends that he is entitled to judgment as a matter of law or, alternatively, to a new trial. We are unpersuaded.
 
 
 47
 A. Gleason's Request for Judgment as a Matter of Law
 
 
 48
 Gleason contends that the district court should have granted him judgment dismissing Gierlinger's retaliation claim as a matter of law on the ground that Gierlinger did not, in this "dual motivation" case, prove "substantially more than simply that a bad or impermissible motive was a factor in the employer's employment decision" (Gleason brief on appeal at 35 (emphasis in original)), i.e., did not prove "that it was a substantial or predominating factor" (id. at 36; see also Gleason reply brief at 2 ("predominating " (emphasis in original))). Preliminarily, we note that this argument does not state the correct legal standard, for in a case in which the defendant has advanced a neutral reason for the employment decision, the plaintiff's burden is to show that the impermissible factor was a "substantial" or "motivating factor" in her adverse treatment, Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) ( "Mt.Healthy "). She is not required to show that the impermissible factor dwarfed all other factors. See, e.g., Price Waterhouse v. Hopkins, 490 U.S. 228, 247, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion) (in a mixed-motives case it "makes no sense to ask whether the legitimate reason was 'the "true reason" ' " for the decision (emphasis in original)); id. at 259, 109 S.Ct. 1775 (White, J., concurring) (a plaintiff is "not required to prove that the illegitimate factor was the ... principal ... reason for petitioner's action"). Even aside from Gleason's misdescription of the burden of proof, however, we reject his contention that he should have been granted judgment as a matter of law because that contention has not been preserved for appeal.
 
 
 49
 A party is not entitled to challenge on appeal the sufficiency of the evidence to support the jury's verdict on a given issue unless he has timely moved in the district court for judgment as a matter of law ("JMOL") on that issue. See, e.g., Cone v. West Virginia Pulp & Paper Co., 330 U.S. 212, 218, 67 S.Ct. 752, 91 L.Ed. 849 (1947); Pittman v. Grayson, 149 F.3d 111, 119 (2d Cir.1998); Galdieri-Ambrosini v. National Realty & Development Corp., 136 F.3d 276, 286-87 (2d Cir.1998). See also id. at 287 (review may be granted in the absence of compliance with the pertinent principles if "required to prevent manifest injustice" (internal quotation marks omitted)). In the district court, a party who seeks JMOL may move for that relief during trial at any time prior to the submission of the case to the jury. See Fed.R.Civ.P. 50(a)(2). The party may renew the motion within 10 days after judgment, see Fed.R.Civ.P. 50(b), and must do so in order "[t]o preserve for appeal a challenge to the denial of a pre-verdict motion" for JMOL, Varda, Inc. v. Insurance Co. of North America, 45 F.3d 634, 638 (2d Cir.1995).
 
 
 50
 The JMOL motion "must at least identify the specific element that the defendant contends is insufficiently supported." Galdieri-Ambrosini v. National Realty & Development Corp., 136 F.3d at 286. A generalized challenge is inadequate. See, e.g., Cruz v. Local Union No. 3 of the International Brotherhood of Electrical Workers, 34 F.3d 1148, 1155 (2d Cir.1994); Lambert v. Genesee Hospital, 10 F.3d 46, 53-54 (2d Cir.1993) ("the specificity requirement is obligatory"), cert. denied, 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994).
 
 
 51
 In the present case, Gleason states that he moved for JMOL after the entry of judgment, but the record does not reveal any proper motion for that relief. He made a posttrial motion that referred in passing to Rule 50, as well as to Fed.R.Civ.P. 59, which governs motions for new trials; but the only relief requested in that motion was the "granting [of] a new trial." His motion was accompanied by a document entitled "Declaration in Support of a Motion for a New Trial " (emphasis added). The memorandum of law that he eventually submitted stated tersely that JMOL was sought, but it challenged only evidentiary rulings and jury instructions, and did not present any arguments as to why the court should grant JMOL.
 
 
 52
 Not surprisingly, the district court did not view Gleason's motion as a request for JMOL. In its ruling, the court stated:
 
 
 53
 Although the Notice of Motion filed September 17, 1996 facially indicated that relief was additionally sought pursuant to FRCvP 50, such provision applies only to a motion seeking a judgment as a matter of law. As the arguments offered by Gleason make clear, the granting of a new trial was the only relief sought by him.
 
 
 54
 Posttrial Order at 2 n. 1. Gleason did not thereafter ask the district court for reconsideration or otherwise suggest that there was any aspect of his motion that the court had overlooked. We conclude that there was no proper posttrial motion by Gleason for JMOL.
 
 
 55
 More fundamentally, it does not appear that Gleason ever, during the trial, moved for judgment as a matter of law dismissing Gierlinger's retaliation claim for insufficiency of the evidence. Although his brief on appeal makes vague reference to a JMOL motion "made at the close of the plaintiff's case" (Gleason brief on appeal at 32), he furnishes no record citation to that motion, and our review of the record reveals only a motion that did not address Gierlinger's claim for retaliation. Gleason's motion at the close of Gierlinger's case described her claim as "basically" a complaint that Gleason "was responsible for harassment [she] suffered," and he argued that there was no "evidence that he was directly responsible for some misconduct or knew of it and failed to stop it even though he had the capacity to do so." (Third Trial Tr. Aug. 21, 1996, at 175.) Gleason went on to argue that the unrebutted evidence showed also that he lacked the authority to look into Gierlinger's harassment complaints after his own superior officer had completed an investigation (id. at 176), and he concluded that "there's simply no theory by which liability under 1983, under the plaintiff's Equal Protection claim, can be premised and so the defendant's entitled to judgment as a matter of law as to that claim" (id. at 177).
 
 
 56
 Gleason's motion at the close of Gierlinger's case contained no reference whatever to her claim for retaliation or to any failure of proof with respect to the motivation for the termination of her employment. And although we have found one point at which, following the close of all the evidence, Gleason requested the dismissal of the retaliation claim, that request said simply, "We should focus this case on the retaliation claim and dismiss that before we go any further." (Transcript of Third Trial, separately paginated Charging Conference, Aug. 28, 1996 ("Third Trial Tr. Charging Conf.") at 33.) This cryptic statement did not indicate that the request was based on any insufficiency of the evidence, much less specify the element on which the proof was supposedly deficient.
 
 
 57
 We conclude that Gleason's present challenge to the sufficiency of the evidence to support Gierlinger's retaliation claim has not been preserved for appellate review.
 
 B. The Request for a New Trial
 
 58
 Alternatively, Gleason argues that he is entitled to a new trial on the ground that the district court (1) improperly excluded evidence that would have proved that the termination of Gierlinger's employment was not motivated by retaliation, and (2) gave the jury erroneous instructions with respect to Gleason's burden in a dual-motivation case. Both contentions lack merit.
 
 1. The Excluded Evidence
 
 59
 At trial, Gleason's principal defense to the retaliation claim was that he was not the person who made the ultimate decision to terminate Gierlinger's employment and that Gierlinger would have been terminated even if he had not made his negative recommendation. In aid of this defense, he presented the testimony of Deputy Superintendent O'Grady, whose responsibility it was to review a probationary trooper's file with a view to making a recommendation, for or against retention, to the ultimate decisionmaker, the NYSP superintendent.
 
 
 60
 O'Grady testified that in making the recommendation that Gierlinger not be retained, he reviewed copies of the various reports, memoranda, and evaluations in Gierlinger's file, including Gleason's memorandum to the field commander, Deputy Superintendent Strojnowski, recommending that Gierlinger not be retained. However, O'Grady testified that in every case, when he reviewed a probationary trooper's file for these purposes, he gave less weight to the recommendation of the troop commander, a major, than to the recommendations written by supervisors such as the zone commander, who could be a sergeant or a lieutenant and hence lower ranking than the troop commander. He weighted the evaluations in this way because the troop commander "is not the one that is supervising the individual and making the firsthand determinations and accounts of the individual's performance and actions." (Third Trial Tr. Aug. 27, 1996, at 16.) O'Grady testified that he followed this practice in recommending that Gierlinger not be retained.
 
 
 61
 Gleason's counsel then sought to pose a hypothetical question, to wit, whether O'Grady would have recommended that Gierlinger not be retained if her file had contained the same performance evaluations, the same investigative reports, and the same negative recommendation from the zone commander, but Gleason's recommendation had instead been to retain her. The district court sustained Gierlinger's objection on the ground that the hypothetical was "too contrived." (Id. at 17.) O'Grady ended his direct testimony by reiterating that the lower-level supervisors' recommendations had "the greatest influence on my analysis ... and my eventual recommendation," while the troop commander's recommendation was given the "least" weight. (Id. at 38-39.)On this appeal, Gleason argues that the court's ruling that O'Grady could not answer his hypothetical question unfairly deprived him of the opportunity to prove that, regardless of Gleason's recommendation, Gierlinger would not have been retained. We disagree.
 
 
 62
 The trial court has considerable discretion in determining whether to admit or exclude evidence, see, e.g., Perry v. Ethan Allen, Inc., 115 F.3d 143, 150 (2d Cir.1997); Healey v. Chelsea Resources, Ltd., 947 F.2d 611, 619 (2d Cir.1991), and to exclude even relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice or confusion, or by its cumulative nature, see Fed.R.Evid. 403. Further, "[e]rror may not be predicated upon a ruling which ... excludes evidence unless a substantial right of the party is affected...." Fed.R.Evid. 103(a); see also Fed.R.Civ.P. 61 (erroneous evidentiary ruling will not justify the grant of a new trial unless allowing the judgment to stand would be "inconsistent with substantial justice").
 
 
 63
 In the present case, we see no injustice or abuse of discretion in the court's refusal to allow O'Grady to answer Gleason's hypothetical question. First, as the district court noted in denying Gleason's motion for a new trial,
 
 
 64
 the substance of [Gleason's] theory--to wit, that Gleason's recommendations did not carry significant weight in the particular decision-making process--was fully presented to the jury through Gleason's own testimony and the testimony of others; any further evidence would have been cumulative.
 
 
 65
 Posttrial Order at 4. Indeed, O'Grady himself had repeatedly so testified. Thus, at every stage, Gleason has argued to the court that O'Grady's testimony was ample to permit the jury to infer that Gleason's recommendation played no role in the decision that Gierlinger should not be retained. (See, e.g., Third Trial Tr. Aug. 28, 1996, at 9-10 (Gleason's counsel: "from the evidence that was presented," the jury could "certainly ... infer" that Gleason's recommendation did not meaningfully influence O'Grady's recommendation); Gleason Memorandum of Law in Support of Post-judgment Motion at 8 ("[t]he substance of O'Grady's testimony clearly would have allowed a jury to find, whatever the defendant's recommendation or motivation might have been, that the plaintiff would have been terminated for the deficiencies in her performance")).
 
 
 66
 Further, one premise of the hypothetical was that O'Grady would possess the same negative reports and evaluations as to Gierlinger's conduct and performance. Yet it was Gierlinger's contention that the investigations leading to those reports were ordered by Gleason in retaliation for her sexual harassment complaints, and that the reports themselves were thus contrived bases for evaluating her performance. That theory found some support in evidence that the early, routine evaluations as to Gierlinger's performance made by the senior trooper to whom she was assigned and who observed her daily were positive; that the spate of special investigations and negative reports came on the heels of Gierlinger's complaints of sexual harassment; and that one of those investigations explored a matter that typically was not investigated. Thus, as the district court noted in its Posttrial Order, even a negative answer by O'Grady to the hypothetical, "would not have insulate[d] or absolve[d Gleason] of his personal conduct which the jury found to have violated Gierlinger's constitutional and state-law rights." Posttrial Order at 4.
 
 
 67
 Given the trial evidence, it was well within the bounds of the court's discretion to exclude Gleason's hypothetical which artificially segmented Gierlinger's theory and supporting evidence.
 
 2. The Instructions
 
 68
 Gleason also contends that he is entitled to a new trial because he "did not receive the 'Mt. Healthy ' dual or mixed motive charge (or a close approximation thereof)." (Gleason brief on appeal at 39.) He does not identify any portion of the district court's charge that he contends was flawed, and he provides little further explanation as to the charge he contends the district court should have given. At trial, he urged the court to instruct the jury that[f]or you to find in the plaintiff's favor on this claim, it is not enough that you find that the improper factor, that is, an intent to retaliate, played some part in the defendant's recommendation, but you must also determine that the plaintiff has met her burden of establishing that an [ ] intention to retaliate played a motivating and substantial role in the eventual termination of the plaintiff.
 
 
 69
 (Gleason Proposed Jury Instructions dated August 22, 1996, at 16-17 (emphasis added).) In the circumstances of the present case, this was not an appropriate instruction, and our review of the record reveals that the instructions given were adequate.
 
 
 70
 In order to prove a § 1983 claim for retaliation, a plaintiff bears the burden of demonstrating that her engagement in protected conduct "was at least a 'substantial' or 'motivating' factor" in the adverse action taken against her by the state defendant. White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1058 (2d Cir.) (quoting Mt. Healthy, 429 U.S. at 287, 97 S.Ct. 568), cert. denied, 510 U.S. 865, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993); see, e.g., Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir.1994) (plaintiff must show that a retaliatory motive "played a substantial part in the state action at issue" (internal quotation marks and brackets omitted)). If the plaintiff satisfies her burden, the defendant has the opportunity to escape liability by proving that "[he] would have taken the same adverse action in the absence of the protected [conduct]." Heil v. Santoro, 147 F.3d 103, 110 (2d Cir.1998); see, e.g., Mt. Healthy, 429 U.S. at 287, 97 S.Ct. 568; Howard v. Senkowski, 986 F.2d 24, 26 (2d Cir.1993) ("the alleged offender is entitled to the defense that [he] would have taken the same action in the absence of [a retaliatory] motive").
 
 
 71
 Further, in a retaliation case, as in all § 1983 cases, the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury. See, e.g., Martinez v. California, 444 U.S. 277, 285, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980); Warner v. Orange County Department of Probation, 115 F.3d 1068, 1071 (2d Cir.1996) ("in cases brought under § 1983 a superseding cause, as traditionally understood in common law tort doctrine, will relieve a defendant of liability"). Thus, even if the plaintiff shows that the defendant was motivated at least in part by retaliatory animus and the defendant fails to prove that, absent that retaliatory animus, he would have taken the same action, the plaintiff must still demonstrate that the causal connection between the defendant's action and the plaintiff's injury is sufficiently direct. See, e.g., Jeffries v. Harleston, 52 F.3d 9, 14 (2d Cir.1995) (reversing judgment in favor of a university professor on the ground that there was "a superseding cause breaking the causal chain between the tainted [retaliatory] motives of [certain defendants] and the decision to limit [the professor's] term"), cert. denied, 516 U.S. 862, 116 S.Ct. 173, 133 L.Ed.2d 114 (1995); see also Taylor v. Brentwood Union Free School District, 143 F.3d 679, 687 (2d Cir.1998) (reversing judgment in favor of a suspended teacher on the ground that "no reasonable jury could find [the defendant's allegedly racially motivated] actions to be the cause of [the teacher's] injury"), petition for cert. filed, 67 U.S.L.W. 3284(U.S. Sep. 22, 1998) (No. 98-606).
 
 
 72
 Under Mt. Healthy, therefore, Gierlinger's initial burden was to demonstrate that retaliation was a substantial or motivating factor in the actions taken against her by Gleason, i.e., to show that her complaints of sexual harassment were a substantial or motivating factor in Gleason's ordering one or more of the investigations or in his negative recommendation. Gierlinger was of course also required to prove that her termination was proximately caused by Gleason's retaliatory conduct. But since Gierlinger's claim was not that Gleason personally made the decision to terminate her but rather that he made retaliation-based decisions and recommendations that led to her termination, the proximate cause determination was governed by ordinary principles of causation, not by the Mt. Healthy substantial-or-motivating-factor test. Gleason's requested charge implied instead that Gierlinger was required to prove that the ultimate decisionmakers too were substantially motivated by retaliation. In this case, that request inappropriately conflated dual-motivation analysis with principles of proximate cause. The Mt. Healthy test was satisfied by proof that the recommendation and conduct of Gleason were substantially motivated by retaliation; and the jury could find the necessary causation if it concluded that the retaliatory actions by Gleason proximately led to the ultimate decision.
 
 
 73
 Our review of the district court's instructions leads us to the conclusion that the jury was given the proper Mt. Healthy framework. The court charged the jury that, in order to recover on her claim of retaliation, Gierlinger had the burden of proving by a preponderance of the evidence that Gleason's "reason or one of his reasons for his adverse decision" and for "recommending her termination" "was that she had filed complaints of having been sexually harassed." (Transcript of Third Trial, separately paginated Charge of the Court, Aug. 28, 1996 ("Third Trial Tr. Instructions"), at 13.) It instructed that if Gierlinger met that burden, but "Gleason had certain legitimate and non-discriminatory reasons for his actions," Gleason had the burden "to show that .... in spite of having that motivation he nevertheless would have recommended her termination." (Id.) And it instructed that Gierlinger was required to prove that Gleason's culpable acts proximately caused her termination. (See, e.g., id. at 9 ("[Gierlinger's] injuries and harm, if you find any ... must have been proximately caused by the acts of the defendant.").)
 
 
 74
 Further, after receiving a request from the jury to clarify the second special-verdict question ("2. If you [found plaintiff has proven unconstitutional retaliation by Gleason] do you find that the defendant has proven by the preponderance of the evidence that he would have taken the same action for non-discriminatory reasons?"), the court again gave a correct supplementary instruction. It instructed that if the jury found Gierlinger to have satisfied her burden of showing that Gleason acted with "improper reasons, unconstitutional reasons, namely ... that she had made those complaints of sexual harassment," then the jury must determine whether Gleason met his own burden of showing that "those reasons aside he would have taken the same action." (Third Trial Tr. Sep. 3, 1996, at 21-22).
 
 
 75
 We see no basis for a new trial.
 
 
 76
 III. GIERLINGER'S CHALLENGES TO THE POSTTRIAL ORDER
 
 
 77
 On her appeal, Gierlinger principally challenges so much of the Posttrial Order as denied her motion for prejudgment interest and denied in part her request for attorneys' fees pursuant to 42 U.S.C. § 1988. Her challenges to the denial of prejudgment interest and to certain of the fee rulings have merit.
 
 A. Prejudgment Interest
 
 78
 In a suit to enforce a federal right, the question of whether or not to award prejudgment interest is ordinarily left to the discretion of the district court, see, e.g., Endico Potatoes, Inc. v. CIT Group/Factoring, Inc., 67 F.3d 1063, 1071-72 (2d Cir.1995), which is to take into consideration "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court," Securities & Exchange Commission v. First Jersey Securities, Inc., 101 F.3d 1450, 1476 (2d Cir.1996) (internal quotation marks omitted), cert. denied, --- U.S. ----, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997); see, e.g., Wickham Contracting Co. v. Local Union No. 3, 955 F.2d 831, 833-34 (2d Cir.1992), cert. denied, 506 U.S. 946, 113 S.Ct. 394, 121 L.Ed.2d 302 (1992).
 
 
 79
 To the extent, however, that the damages awarded to the plaintiff represent compensation for lost wages, "it is ordinarily an abuse of discretion not to include pre-judgment interest." Saulpaugh v. Monroe Community Hospital, 4 F.3d 134, 145 (2d Cir.1993) (emphasis in original, internal quotation marks omitted) (backpay award under Title VII), cert. denied, 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994); see also Sands v. Runyon, 28 F.3d 1323, 1327 (2d Cir.1994) (same under Rehabilitation Act, 29 U.S.C. § 701 et seq.); Equal Employment Opportunity Commission v. County of Erie, 751 F.2d 79, 81 (2d Cir.1984) (same under Equal Pay Act, 29 U.S.C. § 206(d)); Donovan v. Sovereign Security, Ltd., 726 F.2d 55, 58 (2d Cir.1984) (same under Fair Labor Standards Act, 29 U.S.C. § 201 et seq.). Awarding prejudgment interest in such cases prevents the defendant employer from attempting to "enjoy an interest-free loan for as long as it can delay paying out back wages," Saulpaugh v. Monroe Community Hospital, 4 F.3d at 145 (internal quotation marks omitted), and helps to ensure that the plaintiff is meaningfully made whole, see, e.g., Loeffler v. Frank, 486 U.S. 549, 558, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988) ("Prejudgment interest, of course, is an element of complete compensation." (internal quotation marks omitted)). These principles apply with equal force to awards of backpay in cases brought under § 1983. See Miner v. City of Glens Falls, 999 F.2d 655, 662 (2d Cir.1993) (upholding prejudgment interest award in § 1983 case); see also Equal Employment Opportunity Commission v. County of Erie, 751 F.2d at 81 ("the express statutory provision for the award of prejudgment interest is unnecessary").
 
 
 80
 In the present case, the district court denied Gierlinger's motion for prejudgment interest on the jury's $117,739 damages award, stating two grounds: (1) that the jury's award itself included such interest, and (2) that Gierlinger had failed to mitigate her damages. With respect to the former, the court stated that
 
 
 81
 [i]nasmuch as the jury awarded monetary damages to compensate for all "financial damages" (Court Exh 1 [the special verdict form] ) (emphasis supplied) suffered in connection with any loss of past and/or future income and it had been instructed on the concept of present valuation--albeit in the context of future damages--, this Court presumes that the jury included in its damage deliberations and calculations an amount of prejudgment interest deemed by it to be appropriate on the portion of the award representing past lost wages--i.e., that it had fixed in mind that the plaintiff was to be fully compensated now for what she should have received earlier.
 
 
 82
 Posttrial Order at 7-8. With respect to its second reason, the court stated that "the evidence at trial established that Gierlinger has had the opportunity and ability to mitigate her economic damages through other employment," that the jury award thus "fully compensate[d] her for any actual damages she has suffered." Id. at 8. The court concluded that "an award of prejudgment interest would be an unjustified windfall." Id. In the circumstances of this case, neither ground was appropriate.
 
 
 83
 The court's presumption that the jury's award included prejudgment interest finds no support in the record. The special verdict form merely asked the jury to determine the extent, if any, of Gierlinger's "financial damages for loss of past and future income." The natural reading of this language does not require the jury to engage in complicated computations of interest, but merely asks it to find the amount of the "income" that Gierlinger lost as a result of her termination. In the absence of specific instructions, neither the word "financial" nor the word "damages" meaningfully alters that natural reading. Cf. Bank of New York v. Amoco Oil Co., 35 F.3d 643, 662 (2d Cir.1994) ("under the reasonable expectations of the ordinary businessperson, use of the word 'damages' [in a settlement agreement] was not intended to include prejudgment interest").
 
 
 84
 Further, the concept of prejudgment interest was at no point mentioned to the jury. Although instructed that it would be required to reduce to present value any amounts that it found Gleason's conduct would cause Gierlinger to lose in the future, the jury was not instructed that its duties included the calculation of interest on wages lost in the past.
 
 
 85
 Nor, given the trial evidence as to Gierlinger's loss of back wages, is the size of the award so great as to suggest that the jury on its own sought to award interest on lost past wages. Gierlinger testified that her starting salary as a probationary trooper was approximately $19,000 per year and that, in the eight years between her termination and the third trial, she had worked for approximately five years, earning $6,000-$9,000 annually. The $117,739 awarded by the jury (which is approximately one-third the size of the $340,000 loss calculated by the first jury in 1992) corresponds roughly to the difference between the lost NYSP salary--at the starting level--for the past eight years and the amount Gierlinger had earned instead. We conclude that the district court erred in "presum[ing]" that the jury included prejudgment interest in its damage award.
 
 
 86
 Nor was the court entitled to deny prejudgment interest on the basis of its own view that Gierlinger had not sufficiently mitigated her damages, for a denial on the basis of that view invaded the province of the jury. The jury was expressly instructed that Gierlinger had an obligation to take steps to mitigate her damages and that a failure to mitigate should reduce the size of her award. (See Third Trial Tr. Instructions at 16 ("She has to have shown to you that she has done everything she could to what we call mitigate, to lessen the effect of those damages.")). Since there is no indication to the contrary, "[i]t must be assumed that the jury followed instructions," Trademark Research Corp. v. Maxwell Online, Inc., 995 F.2d 326, 340 (2d Cir.1993), and that the jury's award reflected a reduction for such failure to mitigate as the jury found. The court was not entitled to deny prejudgment interest on the basis that the jury did not adequately take the mitigation factor into account.
 
 
 87
 We thus conclude that neither of the grounds relied on by the district court in denying prejudgment interest was tenable, and that the denial was an abuse of discretion. We therefore remand for the calculation and award of such interest.
 
 
 88
 We note that an award of prejudgment interest is not appropriate with respect to an award of damages for future losses, see, e.g., Scarfo v. Cabletron Systems, Inc., 54 F.3d 931, 961 (1st Cir.1995); Boyle v. Pool Offshore Co., 893 F.2d 713, 719 (5th Cir.1990), and if there were a reasonable basis for inferring that part of the jury's award sought to compensate for future losses, we would have the district court determine what portion of the award should be attributed to each category of loss, see Fed.R.Civ.P. 49(a) (essential question which was not included on special verdict form, and whose inclusion was not requested by the parties, should be answered by the court). In the present case, however, we think it clear from the record that the jury's award represented damages only for lost past, not future, income. In the charging conference discussion among the parties and the court as to what the jury was to be told with respect to how to discount an award of damages for lost future income, Gleason suggested that the court "simply ... tell the[ jury] if they get to that point to come back and ask for" additional instructions as to such factors as life expectancy. (Third Trial Tr. Charging Conf. at 34.) The court adopted that suggestion; and, after telling the jury of the need to discount and describing only generally how such a calculation is performed, the court said "if you get into that situation I will provide you with percentage rates and even give you a computer if you need it." (Third Trial Tr. Instructions at 16). We have seen no indication in the record that the jury (which did request supplemental instructions on liability) ever returned to the court for further instruction on the discounting of damages for future losses.
 
 
 89
 Our inference that the jury did not return for such instructions--and that it gave no other indication that it meant to award damages for future losses--is further supported by the litigation posture of Gleason. In his brief on appeal, he in no way suggests that the jury ever sought such instructions. And in the district court, when Gierlinger moved for prejudgment interest, Gleason did not oppose.
 
 
 90
 We therefore remand for amendment of the judgment to include an award of prejudgment interest to Gierlinger on the entire $117,739 verdict.
 
 B. Attorneys' Fees
 
 91
 Gierlinger requested attorneys' fees at the rate of $200 per hour for 39 hours spent by her original attorney Pamela H. Thibodeau in preparing the complaint and the first amended complaint and in opposing defendants' motion to dismiss; and $235 per hour for 873.6 hours spent on her case in the six years thereafter by her second attorney Willard M. Pottle, Jr., including pretrial discovery, motion practice, the first, second, and third trials, and the appeal following the first trial. The district court granted the request in part; but it refused to award any fees with respect to the appeal following the first trial, preparation for the second trial, and motions that were not made; and it denied in part the fees requested for the second trial and for motion practice and trial preparation time between the second and third trials. The court also denied any fees for services performed by Thibodeau. As to the fees awarded for Pottle's services, the court allowed a rate of $195 an hour. Gierlinger challenges each of the denials.
 
 
 92
 The calculation of the reasonable fee to be awarded to a prevailing § 1983 claimant pursuant to 42 U.S.C. § 1988 is to be based principally on a "lodestar" figure, which is arrived at by multiplying "the number of hours reasonably expended on the litigation ... by a reasonable hourly rate." Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); see, e.g., LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 763-64 (2d Cir.1998); Cruz v. Local Union Number 3 of the International Brotherhood of Electrical Workers, 34 F.3d 1148, 1159 (2d Cir.1994). The district court must thus
 
 
 93
 examine the hours expended by counsel and the value of the work product of the particular expenditures to the client's case. Efforts put into research, briefing and the preparation of a case can expand to fill the time available, and some judgment must be made in the awarding of fees as to diminishing returns from such further efforts.... In making this examination, the district court does not play the role of an uninformed arbiter but may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties.
 
 
 94
 DiFilippo v. Morizio, 759 F.2d 231, 235-36 (2d Cir.1985); see, e.g., Luciano v. Olsten Corp., 109 F.3d 111, 116 (2d Cir.1997); Clarke v. Frank, 960 F.2d 1146, 1153 (2d Cir.1992). If the court determines that certain claimed hours are "excessive, redundant, or otherwise unnecessary," Hensley v. Eckerhart, 461 U.S. at 434, 103 S.Ct. 1933, the court should exclude those hours in its calculation of the lodestar.
 
 
 95
 In light of the district court's familiarity with the case, its award of attorneys' fees is reviewed only for abuse of discretion. See, e.g., In re Bolar Pharmaceutical Co. Securities Litigation, 966 F.2d 731, 732 (2d Cir.1992) (per curiam). However, reviewable for " 'abuse of discretion' is not the equivalent of 'unreviewable,' " id., and it is important that we "be informed by the record of why the district court acted as it did," id.; see Orchano v. Advanced Recovery, Inc., 107 F.3d 94, 99 (2d Cir.1997). Thus, when the court concludes that certain hours are not deserving of compensation, it must ordinarily state its reasons for excluding those hours "as specifically as possible" in order to permit meaningful appellate review. LeBlanc-Sternberg v. Fletcher, 143 F.3d at 764 (internal quotation marks omitted); Orchano v. Advanced Recovery, Inc., 107 F.3d at 99.
 
 
 96
 With these principles in mind, we reject Gierlinger's challenges to the denial of fees for work in connection with motions and applications that were not made; but we find merit in most of her other challenges, principally because the court abused its discretion in denying compensation for certain categories of work, and because the court failed to provide explanations for other exclusions.
 
 1. Fees for Gierlinger's Original Attorney
 
 97
 The district court denied Gierlinger all fees for services performed by Thibodeau, her first attorney, stating only that "the request for fees founded upon hours expended by Thibodeau represents a request for redundant, unnecessary, and unavailing work." Posttrial Order at 13. No explanation was provided by the district court, and we are forced to speculate in our attempt to reconcile this assessment with the record, for Thibodeau's work is clearly reflected in Gierlinger's second amended complaint, which provided the framework for the litigation.
 
 
 98
 Thibodeau drafted both the original complaint and the first amended complaint. As described in Part I.C. above, when the individual defendants contended that the first amended complaint did not sufficiently describe the conduct attributed to each individual, the district court agreed and granted Gierlinger leave to file a second amended complaint. The second amended complaint was filed by Pottle, Thibodeau having recently left the private practice of law. It is clear, however, that most of the work reflected in the second amended complaint was the work of Thibodeau, not Pottle. Both the first and second amended complaints were 32-paragraph pleadings stating five claims for relief, including one claim under Title VII, one under § 1983, and three under state law. The principal difference was that in p 4, which in both pleadings identified the defendants, the second amended complaint summarized the conduct attributed to each individual defendant. An additional difference was that three of the five ad damnum paragraphs of the first amended complaint were revised in the second to omit the phrase "punitive damages in the amount of $500,000." In all other respects, the second amended complaint was virtually verbatim the same as the first amended complaint. (Indeed, so similar are the two pleadings that the parties included only the first amended complaint in their joint appendix on this appeal, and they called it, in the table of contents, the second.)
 
 
 99
 Further, for his services from the time of his entry into the case through the filing of the second amended complaint, Pottle billed only 12.3 hours, in which he apparently, inter alia, conferred with his client, familiarized himself with the case, and drafted particularized descriptions of the conduct attributed to each of the nine individual defendants. It hardly seems that he would have had time within those 12.3 hours to, in addition, redo the substantial drafting job already done by Thibodeau in the first amended complaint. We see no basis on which the court could reasonably find Thibodeau's work redundant.
 
 
 100
 It is hypothetically possible that the court viewed Thibodeau's work as "unnecessary" or "unavailing" because the first amended complaint asserted claims against defendants other than Gleason, and because as to those defendants Gierlinger did not succeed. However, this possibility seems inconsistent with the record, for a prevailing plaintiff should be compensated even for work done in connection with an unsuccessful claim if that claim was intertwined with the claim on which she succeeded, see, e.g., Hensley v. Eckerhart, 461 U.S. at 433-37, 103 S.Ct. 1933; LeBlanc-Sternberg v. Fletcher, 143 F.3d at 762; Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1183 (2d Cir.1996), and the district court found--no doubt on this basis--that all of the time spent by Pottle in pretrial discovery and preparation for the first trial (while many defendants other than Gleason remained in the case) was reasonable and necessary.
 
 
 101
 In short, we see no basis on which the time spent by Thibodeau in drafting the initial complaints and in pursuit of the case thereafter--at least prior to the defense motions to dismiss--could reasonably have been deemed duplicative, unreasonable, or unnecessary.
 
 
 102
 It is also possible that some of the time spent by Thibodeau in defending the first amended complaint against defendants' motions to dismiss--for example, NYSP's motion to dismiss the § 1983 claim--may properly be viewed as unreasonable. See, e.g., Will v. Michigan Department of State Police, 491 U.S. 58, 64, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (neither a state agency nor a state official sued in his official capacity is a "person" within the meaning of § 1983) (decided six days after this suit was commenced). However, the opposition to defendants' motions consumed only 13.8 of Thibodeau's total 39 hours, and it is unclear how much of even those 13.8 hours were devoted to work that was not reasonably necessary.
 
 
 103
 We conclude that the denial of fees for Thibodeau's work should be vacated, and we remand for an award of fees for at least 25.2 hours of her services. Gierlinger is free on remand to submit more informative evidence as to the nature of Thibodeau's services for the remaining 13.8 hours.
 
 2. Fees in Connection with the Second Trial
 
 104
 Gierlinger sought fees for 66.3 hours spent by Pottle in preparing for the second trial, plus 103.1 hours in conducting that trial for two weeks prior to the district court's sua sponte declaration of a mistrial. The court denied fees for all of the preparation time, stating that "[i]n light of the plaintiff's attorney's familiarity with the case, such are redundant and excessive." Posttrial Order at 11 n. 4. It denied all but 70 hours of the trial time, stating as follows:
 
 
 105
 Recognizing ... that the lack of a fee award for such time spent reduces the effective compensation rate for all the time expended on the case and acknowledging that the undersigned should have more tightly controlled the reins guiding the conduct of himself and the attorneys, but also noting that the plaintiff's attorney is not blameless for this mistrial, this Court finds that compensation for 70 hours of work for such period of time is reasonable.
 
 
 106
 Id. at 11-12 (footnote omitted) (emphasis added). We are troubled by both rulings.
 
 
 107
 First, we cannot agree that it was appropriate to award no fees for trial preparation time. Despite there having been a prior trial of the case, no competent attorney would embark on a retrial without some preparation. This is especially true when there has been a lengthy interval between the two trials. Here, the first trial had concluded more than two years before the second trial began. Further, the second trial was not to have precisely the same scope as the first, for at the first trial there were nine defendants, whereas at the second there was one. While this undoubtedly simplified the issues somewhat, the elimination of eight out of nine defendants could not have simplified the case proportionately, for some of the eliminated defendants were alleged to have engaged in conduct that was set in motion by Gleason. In any event, the differences would doubtless have required some organizational effort with respect to the presentation of Gierlinger's case against Gleason.
 
 
 108
 We conclude that it was unquestionably reasonable for Pottle, after the two-year hiatus, to, inter alia, review the three-week transcript of the first trial, review files to refresh his recollection, organize his proposed exhibits, and prepare his witnesses. In sum, at least a significant portion of the time claimed was reasonably necessary.
 
 
 109
 Second, we cannot agree that it was appropriate to compensate Pottle for less than all of the time reasonably spent conducting the second trial, for the record belies the district court's rationale that Pottle bore significant responsibility for the mistrial. When the court sua sponte declared the mistrial, it initially stated that the reason was that "Gierlinger was interviewed by a reporter ... with Mr. Pottle immediately present, and that resulted in a story [about the trial] in the next day's papers." (Transcript of Second Trial ("Second Trial Tr."), July 28, 1994, at 40.) However, when Pottle strenuously denied having any involvement in the publicity, the court stated that it would not have to prove Pottle's involvement because the publicity was not the real reason for the mistrial. Thus, after reading the article into the record, the court stated that the publicity
 
 
 110
 in and of itself wouldn't justify declaring a mistrial except I noted particularly and would be prepared to prove it if necessary, except it won't be, the involvement of you, Mr. Pottle, in that.
 
 
 111
 But basically and beyond that and for a second reason, I think the trial has gotten completely out of hand. I blame myself to a high degree for that. We've had strong colloquys going on from time to time throughout the trial and in the presence of the jury, and the matter is out of hand, so I'm declaring a mistrial.
 
 
 112
 (Second Trial Tr. at 43 (emphasis added).) The court stated that the "major" reason for the mistrial was "that I strongly feel that the case has gotten out of control and ought to be re-started, and I take a share of the blame in that myself." (Id. at 48.) The judge again attributed the mistrial to the colloquys at trial as it informed the second jury that he had ended the trial because "the matter has gotten out of hand, that we have had so much argument, condemnation of Mr. Pottle from myself as the trial has gone on ... that that has ... poisoned the well...." (Second Trial Tr. at 52.) And at the third trial, the court explained to the new jury:
 
 
 113
 I considered that I had acted in an erroneous fashion during the trial, parading a lot of legal arguments in front of the jury, [and] I decided that that trial ought to be stopped, aborted, and I did that....
 
 
 114
 (Third Trial Tr. Aug. 28, 1996, at 2.)
 
 
 115
 In sum, although the court initially blamed Pottle for creating the need for a mistrial, it retreated from that position, stating expressly that the publicity, even if attributable to Pottle, "wouldn't justify declaring a mistrial." (Second Trial Tr. at 43.) And at no point did the court identify any misconduct whatever by Pottle at the trial. This record is insufficient to warrant the partial denial of an award of attorneys fees for the second trial on the ground that Pottle should bear significant responsibility for the mistrial.
 
 
 116
 On remand, the district court should award fees for the number of hours reasonably spent by Pottle in connection with preparing for and conducting the second trial.
 
 
 117
 3. Fees for Services Between the Second and Third Trials
 
 
 118
 With respect to the nearly two-year period between the end of the second trial and the commencement of the third trial, Gierlinger sought fees for 206.1 hours of services by Pottle. Those services included making a motion to recuse Judge Elfvin, who had said, also sua sponte, that he would recuse himself but then took no action to do so; responding to and making in limine motions with respect to the evidence to be presented at the third trial; responding to a motion to dismiss the Title VII claims in light of this Court's May 1995 decision in Tomka v. Seiler Corp., 66 F.3d 1295; and preparing for the third trial. The court allowed only 80 hours for this work, stating as follows:
 
 
 119
 For the period August 23, 1994 to August 11, 1996 Pottle seeks compensation for 206.1 hours spent preparing and arguing the plaintiff's motion for the undersigned's recusal, preparing the plaintiff's and responding to the defendant's pretrial motions and arguing such and otherwise preparing for trial. Such amount is excessive and repetitive and will be reduced to 80 hours.
 
 
 120
 Posttrial Order at 12 (footnotes omitted). It appears that the court did not disallow the time spent on the recusal motion, for the court stated that "[s]uch motion had substantial support in the undersigned's own declaration, at the time he declared the mistrial, that he probably would recuse himself." Id. n. 5.
 
 
 121
 Gierlinger infers that, because the district court singled out the recusal motion in this way, the court must have "disallowed all preparation for trial and addressing pretrial motions." (Gierlinger brief on appeal at 11.) We reject this interpretation, since the court allowed fees for 80 hours, whereas Pottle's time records show only 3.9 hours devoted to the recusal motion. We think it likely that the court disallowed all time spent in preparation for the third trial, since it had expressly refused to allow fees for preparation for the second trial. Disallowance of reasonable trial preparation time with respect to the third trial was an abuse of discretion for reasons similar to those stated in Part III.B.2. above. The interval between the second and third trial was nearly two years. Some trial preparation time was necessary. It is not possible, however, to know which other services the court found reasonable and which it found unreasonable, for, except for the statement quoted above, the court provided no explanation. We therefore remand to the district court for the award of a reasonable fee for time spent preparing for the third trial, and for an explanation as to any other time the court viewed as "excessive and repetitive."
 
 
 122
 4. Fees for Motions and Applications Not Made
 
 
 123
 Gierlinger also sought fees for approximately 31 hours in 1996 that Pottle spent preparing the present fee application, plus 11.4 hours he spent in 1992 preparing a fee application following the jury's verdict against Gleason at the first trial. The district court disallowed the 11.4 hours, stating only that "such are duplicative of the time expended on the instant fee application and are, therefore unnecessary and unreasonable." Posttrial Order at 10. Gierlinger challenges this ruling, apparently arguing that the time spent on the fee application in 1996 focused only on the services provided from May 1993 to September 1996 and thus did not duplicate the 11.4 hours spent in 1992.
 
 
 124
 This explanation may be accurate. However, it was Gierlinger's burden to show the reasonableness of the fees she sought, and the time records submitted by Pottle in support of this aspect of Gierlinger's fee application did not indicate that the 1996 work on the fee application related only to the services performed since May 1993. Nor did Pottle's affidavit make any representation as to these services. Given the uninformative material submitted by Gierlinger as to the existence or extent of overlap, we cannot conclude that the district court abused its discretion in denying fees for the earlier 11.4 hours.
 
 
 125
 We also reject Gierlinger's challenges to the court's denial of compensation for some 35 hours spent preparing for motions that were never filed. Gierlinger's brief reveals no basis for reversal of these denials.
 
 5. Fees for Gierlinger I
 
 126
 The district court denied Gierlinger's request for fees for 63.3 hours in connection with Gierlinger I, the appeal following the first trial, on the ground that she was not the prevailing party as to that appeal. We have several difficulties with this denial.
 
 
 127
 Parenthetically, we note that Gierlinger was not entirely unsuccessful in Gierlinger I, for Gleason had urged this Court in part to grant him judgment as a matter of law. We rejected that request, see Gierlinger I, 15 F.3d at 34 n. 1, and thus, Gierlinger prevailed in part on that appeal.
 
 
 128
 More importantly, a § 1983 plaintiff's eligibility for an award of fees under § 1988 does not depend on her success at interim stages of the litigation, but rather depends on the ultimate outcome of the litigation. See, e.g., Hanrahan v. Hampton, 446 U.S. 754, 758-59, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) (per curiam) (reversing award of attorneys' fees to plaintiffs for success on appeal from a directed verdict against them, stating that if plaintiffs lost at their new trial "it could not seriously be contended that [they] had prevailed"). A plaintiff is a prevailing party in the litigation within the meaning of § 1988 if she has "received actual relief on the merits of h[er] claim," Farrar v. Hobby, 506 U.S. 103, 111, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), and she should not necessarily be denied fees for hours expended on interim stages of the case in which a ruling was made in favor of the party against whom she ultimately prevailed. Cf. Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1183 (2d Cir.1996) (a prevailing party may even receive a fee award for time spent on an interlocking claim that was not ultimately successful). Since Gierlinger is the prevailing party in the litigation and the Gierlinger I appeal turned out to be only an intermediate stage, the proper inquiry is not whether Gierlinger's efforts on the appeal itself were successful, but rather whether, in light of the circumstances of the litigation as a whole, those efforts were reasonable.
 
 
 129
 The record reveals that Gierlinger's efforts to defend the first judgment were reasonable and that, indeed, it would be inequitable to deny her fees with respect to Gierlinger I because the problems that led to the partial reversal on that appeal were not attributable to Gierlinger. The errors at the first trial were (a) that the district court did not instruct the jury expressly that it could not find Gleason liable on the § 1983 claim on the basis of a respondeat superior theory, and (b) that the jury was asked to find, as to each defendant, simply whether "there is liability," and was not asked to specify the theory on which it found any defendant liable. This Court concluded that a new trial of the claims against Gleason was required because it was
 
 
 130
 not possible to determine from the [jury] instructions whether the jury found Gleason liable on the theory of respondeat superior, which is not available on a § 1983 claim, or liable for his own performance as a commanding officer.
 
 
 131
 Gierlinger I, 15 F.3d at 34. We went on to note that the failure to give the necessary instructions with respect to respondeat superior liability would not necessarily have required a reversal if the special verdict form had simply required the jury to specify the basis for any finding of liability:[s]ince separate theories of liability with different standards of individual involvement were presented to [the] jury, it would have been better practice and aided appellate review had the trial court made use of special interrogatories on the liability issues.
 
 
 132
 Id.
 
 
 133
 If Gierlinger had proposed erroneous jury instructions, or if she had opposed correct instructions or an appropriate special verdict form, there would be a strong basis for denying her fees for some, if not all, of the hours her attorney expended on Gierlinger I. But the record shows just the opposite. In the charging conference at the first trial, when Gleason's attorney stated that under § 1983, "no one is responsible simply by means of being in charge" because "[t]here's no respondeat superior liability" (Transcript of First Trial, May 20, 1992, vol. 10, at 12), Gierlinger's attorney agreed (id. at 13). And when the court asked whether Gierlinger objected to the addition of a specific instruction that there could be no liability on a respondeat superior theory, her attorney answered in the negative:
 
 
 134
 THE COURT: ... [N]o hurt if the jury has that pointed out to them that if Gleason, for example, can't be held liable because of something [one of Gleason's subordinate officers] did or something like that?
 
 
 135
 . . . . .
 
 
 136
 MR. POTTLE: No, I have no problem with that because I think that's probably the basic charge, that it's directed at the individual.
 
 
 137
 THE COURT: Yeah, that's an add-on part of [sic ] you have no objection?
 
 
 138
 MR. POTTLE: No.
 
 
 139
 (Id. at 13.)
 
 
 140
 Further, Pottle pointed out that the court's proposed special verdict form was not "particularized" as to the possible doctrinal bases for liability and stated that "it's possible that the[ jury] could have one verdict on ... one cause of action ... and another verdict on another cause of action." (Id. at 121-22.) The district court, however, rejected Gierlinger's suggestion that it amend the verdict form. (Id.) Had the court accepted her suggestion, it seems likely that the outcome in Gierlinger I would have been different, and the litigation would have ended in Gierlinger's favor at that point.
 
 
 141
 In sum, the fact that Gierlinger did not entirely succeed in the interim stage represented by Gierlinger I is not material because she is the prevailing party in the litigation. The fact that at the first trial the court did not give a sufficiently specific instruction on the unavailability of respondeat superior liability was not the fault of Gierlinger, whose attorney expressly stated that he had no objection to such an instruction. And the fact that the jury's verdict did not reveal the doctrinal basis for its finding of liability on the part of Gleason was not the fault of Gierlinger, whose suggestion for a sufficiently particularized verdict form had been rejected by the court. Given the goal of § 1988 to compensate a plaintiff for what it has reasonably cost to obtain vindication of her meritorious civil rights claim, we conclude that it was an abuse of discretion to deny Gierlinger attorneys' fees with respect to services performed in connection with Gierlinger I. We recognize that the principal error that led to that reversal was also not the fault of Gleason, who proposed a specific charge on respondeat superior liability. But as between the prevailing party and the person the jury has found to be the wrongdoer, it is the latter who should properly bear the expenses reasonably incurred by the prevailing party. We leave it to the district court on remand to determine, in the first instance, how many of the hours claimed by Gierlinger for services in connection with Gierlinger I were reasonably expended.
 
 
 142
 Gierlinger also contends that the district court should have granted her request for an award of costs in connection with the appeal in Gierlinger I. We disagree. After we issued our decision in favor of Gleason, he filed in this Court his bill of costs in the amount of $2,938.48, and Gierlinger did not file any opposition. Nor did she move either to deny costs or to delay any determination of whether the appellate costs should be taxed against her, in order to hinge that determination on the outcome of the litigation. Accordingly, Gierlinger was taxed costs in the above amount, and that award was, pursuant to Fed. R.App. P. 39(d), included in this Court's mandate. The district court had no discretion to set aside this Court's award of costs to Gleason in connection with Gierlinger I.
 
 6. The Hourly Rate
 
 143
 The rates to be used in calculating the § 1988 lodestar are the market rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Blum v. Stenson, 465 U.S. 886, 896 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); see, e.g., Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 172 (2d Cir.1998); Luciano v. Olsten Corp., 109 F.3d 111, 115 (2d Cir.1997). Further, in order to provide adequate compensation where the services were performed many years before the award is made, the rates used by the court to calculate the lodestar should be "current rather than historic hourly rates," Missouri v. Jenkins, 491 U.S. at 284, 109 S.Ct. 2463; see id. at 283, 109 S.Ct. 2463 ("compensation received several years after the services were rendered ... is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings"); LeBlanc-Sternberg v. Fletcher, 143 F.3d at 764 (instructing district court on remand in seven-year litigation to apply "current rates, rather than historical rates" in order to "compensate for the delay in payment").
 
 
 144
 The court is not necessarily required, however, to award attorneys' fees based on current hourly rates when the delay is due in whole or in substantial part to the fault of the party seeking fees. See, e.g., Sands v. Runyon, 28 F.3d at 1334; Saulpaugh v. Monroe Community Hospital, 4 F.3d at 146. Though "it would be harsh to deny counsel some allowance for the time value of attorney's fees delayed by considerations of judicial administration," Sands v. Runyon, 28 F.3d at 1334, there is no inequity in requiring counsel to bear the cost of delay caused by him or by his client.
 
 
 145
 The district court here set a $195 hourly rate for Pottle's work--$40 per hour lower than the rate that Gierlinger had requested--based principally on "the duration of this litigation and the historical rates earned throughout such time-span in this community by similarly experienced and respected attorneys in civil-rights, labor-law and employment-discrimination lawsuits." Posttrial Order at 13 (emphasis added). The court should instead have set the rate of compensation for Pottle's work by reference to current rates. We recognize that a portion of the delay in judgment in this case is attributable to Gierlinger, who requested a postponement of the third trial--originally scheduled for October 2, 1995--in order to participate in an unusually heavy harvest on her family farm. The court promptly adjourned the trial for 10 months. Even if that entire 10-month delay were attributable to Gierlinger (taking into account calendar congestion that might necessitate postponement of the trial until close to the following year's harvest season), the primary responsibility for the protracted nature of this litigation must be placed on the district court, which, as discussed in Parts III.B.2. and III.B.5. above, made unsolicited errors in the first trial that necessitated a second trial, and sua sponte declared a mistrial at the second trial, necessitating the third trial. On remand, the district court should base the rate component of the fee award on current market rates.
 
 CONCLUSION
 
 146
 We have considered all of the parties' contentions in support of their respective positions on these appeals and, except as indicated above, have found in them no basis for reversal. The judgment of the district court is affirmed insofar as it awarded Gierlinger damages in the amount of $117,739. The Posttrial Order is affirmed insofar as it denied Gleason's motion for a new trial and denied Gierlinger's request for costs.
 
 
 147
 The judgment and the Posttrial Order are vacated insofar as they denied Gierlinger prejudgment interest and limited attorneys' fees to the amount of $104,949. The matter is remanded for the inclusion of such interest in the judgment and for the calculation and award of reasonable attorneys' fees consistent with Part III.B. of this opinion. In each instance in which a recalculation of fees is to be made, the court should state its reasons for excluding claimed hours, or for selecting a particular hourly rate, as specifically as possible in order to permit meaningful appellate review.
 
 
 148
 Gierlinger is also awarded costs on the present appeal, including a reasonable attorneys' fee, see Orchano v. Advanced Recovery, Inc., 107 F.3d at 101, which the district court is to calculate and include in its final order.
 
 
 
 *
 Honorable Michael A. Telesca, of the United States District Court for the Western District of New York, sitting by designation