In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-3839

SUSAN SHOTT,

*Plaintiff-Appellee,*

*v.*

RUSH-PRESBYTERIAN-ST. LUKE'S MEDICAL CENTER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 94 C 6783—**Joan B. Gottschall**, *Judge.*

ARGUED APRIL 9, 2003—DECIDED AUGUST 1, 2003

Before FLAUM, *Chief Judge*, POSNER and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* In this appeal, Rush-Presbyterian-St. Luke's Medical Center ("Rush") challenges the amount of attorney's fees and prejudgment interest awarded to the plaintiff, Dr. Susan Shott, after she prevailed on a disability discrimination claim against Rush. The district court awarded plaintiff roughly 66% of the amount of attorney's fees she sought and awarded all the prejudgment interest she requested. Rush argues that the attorney's fees award should be reduced (i) because Shott pursued an unreasonable strategy in the first trial that led to that verdict

being set aside and (ii) because Shott rejected a substantial settlement offer early in the litigation. Rush also maintains that no prejudgment interest should be awarded. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. History

Dr. Susan Shott, who holds a Ph.D. in statistics, began work at Rush in June 1982. In 1986, she was diagnosed with rheumatoid arthritis, though she did not inform Rush of her medical condition until 1994. In January 1993, Dr. Harvey Preisler, head of the Rush Cancer Institute, named Shott as the Director of the Biostatistics Unit of the Institute.

Shott alleges that troubles with Preisler began on March 23, 1994, when she informed him that she was an Orthodox Jew and advised him that she would not be able to work on Passover. Shott alleges that following her request Preisler became hostile toward her and began greatly increasing her work load by requiring her to do excessive computer work and refusing to hire an assistant for her. Further, she claimed that Preisler began scheduling meetings that conflicted with her religious observances.

On May 27, 1994, some three months after the trouble began, Shott first informed Preisler, via a letter from her physician, that she had rheumatoid arthritis. This letter did not specifically request an accommodation for arthritis, but it did note that Shott generally tries to work from 5:30 a.m. to 2:30 p.m. to avoid having to sit in rush hour traffic for an extended period of time, which aggravated her arthritis.

Between May 27 and July 22, 1994, Shott and Preisler did not discuss her disability, but they did exchange correspondence about Shott's requests not to work on Jewish holidays. Also during this period, Shott filed a charge of

religious and disability discrimination against Preisler with the Chicago Commission on Human Relations.

On July 22, Shott gave Preisler a letter in which, for the first time, she informed him that because he had not hired an assistant for her, she was having to do a large amount of data entry on the computer, which greatly aggravated her arthritis. On July 27, Preisler assured Shott that he would hire an assistant, but it appears he never did so. Over the next few months, Shott and Preisler exchanged a series of hostile letters related to Shott's need for accommodation of her disability and her religious observances.

On November 14, 1994, Shott filed this lawsuit against Rush. In her Third Amended Complaint, Shott alleged: (i) disability discrimination by failure to reasonably accommodate her disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*.; (ii) retaliation in violation of the ADA; (iii) religious discrimination in violation of Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e *et seq*.; and (iv) retaliation in violation of Title VII.

In January 1995, at the district court's urging, the parties began settlement negotiations. In March 1995, while Shott still worked at the Cancer Institute, Rush made a settlement offer, whereby Shott would be transferred to a new position in the Department of Neurosurgery with no change in salary for the current academic year. The settlement offer did not include payment for damages, attorney's fees, or costs, and it required Shott to sign a letter that, among other things, stated that she retracted all allegations in her complaint. Shott refused the offer.

On July 11, 1995, Rush transferred Shott from her position in the Cancer Institute and placed her in the previously offered position in the Department of Neurosurgery at a pay cut of roughly 22%. After the transfer, Shott added the retaliation claims to her complaint.

The case went to trial, and the jury found for Rush on the religious-discrimination claim and on both retaliation claims. The jury, however, held for Shott on the disability-discrimination claim, awarding her $250,000 in compensatory damages and $1,000,000 in punitive damages. The district judge, however, on Rush's motion, set aside this verdict and ordered a new trial.

According to the district court's order, a new trial was warranted because the verdict on the ADA claim was against the weight of the evidence and because the plaintiff had presented her case to the jury in an unreasonable manner that likely confused the jury and prejudiced Rush. Specifically, the district court was concerned that the jury may have found Rush liable on the disability claim based on certain events that occurred before Shott ever requested an accommodation.

At the second trial, which was limited to the disability discrimination claim, the jury again returned a verdict for the plaintiff; this time awarding her only $60,000 in compensatory damages and no punitive damages.

Following the second trial, Shott filed a petition for attorney's fees under 42 U.S.C. § 12205, in the amount of $513,388.25. Rush opposed the petition on several grounds, claiming that Shott was entitled to only 25% of the amount sought. The district court found that based on the degree of success Shott achieved in the litigation the award should be reduced by 33% to $343,970.13. Shott later filed petitions for further attorney's fees incurred and for prejudgment interest, which were granted, making the final award $412,679.63 for attorney's fees, $120,801.37 for prejudgment interest, and $21,191.21 in costs; for a total of $554,672.21.

## II.  Analysis

The parties do not dispute that Shott is a "prevailing party" in this litigation and therefore is entitled to "a reasonable attorney's fee" under the ADA. 42 U.S.C. § 12205 (2003). We note that Rush does not challenge the district court's determination that Shott's unsuccessful claims (ADA retaliation, Title VII discrimination, and Title VII retaliation) were related to her successful claim or that, because they were related, Shott could receive at least partial attorney's fees for the work done on these unsuccessful claims. *See Hensley v. Eckerhart*, 461 U.S. 424, 434-35 (1983) (holding that courts may award compensation for time spent pursuing unsuccessful claims that related to the successful claims).

Rush does, however, challenge the reasonableness of the fees awarded on three fronts, arguing (i) that Shott should not receive attorney's fees for the first trial because she engaged in an unreasonable trial strategy that caused the verdict to be set aside; (ii) that the attorney's fee award should be reduced based on Shott's rejection of a substantial settlement offer very early in the litigation; and (iii) that Shott should not receive prejudgment interest.

### A.  Award of Attorney's Fees for First Trial

We review a district court's refusal to reduce an award of attorney's fees for abuse of discretion. *Jaffee v. Redmond*, 142 F.3d 409, 412 (7th Cir. 1998). It is true, of course, that a prevailing party under the ADA is entitled to "an award of fees for all time reasonably expended in pursuit of the ultimate result achieved." *Id*. at 416 (quoting *Hensley*, 461 U.S. at 431). Therefore, when two trials are required to achieve the "ultimate result," a plaintiff should be compensated for both trials, so long as the time spent at both was "reasonably expended." Rush argues, however, that when a plaintiff's unreasonable arguments at the first trial force

the parties to participate in a second proceeding, the plaintiff should not be allowed compensation for both proceedings.

To establish this principle, Rush relies heavily on our second decision in *Jaffee v. Redmond*. 142 F.3d 409, 411 (7th Cir. 1998) [hereinafter *Jaffee II*]. The *Jaffee* case involved two trials and two appeals. In the appeal from the first trial, *Jaffee v. Redmond*, 51 F.3d 1346 (7th Cir. 1995) [hereinafter *Jaffee I*], we held that the district court had erroneously ruled, at the plaintiff's urging, that there was no federal patient-psychotherapist privilege. *Id.* at 1356-58. The plaintiff appealed to the Supreme Court, which affirmed our decision and resolved a circuit split by recognizing a federal evidentiary privilege for patient-psychotherapist communications. *Jaffee v. Redmond*, 518 U.S. 1, 18 (1996). The case was remanded for a new trial, and at the second trial, plaintiff again prevailed. *See Jaffee II*, 142 F.3d at 411. On plaintiff's motion for attorney's fees the district court held that given the split in authority, it was reasonable for the plaintiff to argue against the privilege in the first trial; however, the court awarded no fees for the second trial, reasoning that if the plaintiff had not argued incorrectly at the first trial there would have been no need for the second. *See id.* The plaintiff appealed, and in *Jaffee II*, we reversed the district court, noting that "[w]hile an unreasonable argument that necessitates further proceedings may justify denying compensation for those proceedings, the district court in this case found that Jaffee acted reasonably in arguing against the privilege. . . . [A] fee award is not automatically precluded because the second trial was 'necessitated by' a reasonable but unsuccessful argument." *Id.* at 416.

Other circuits have also observed that so long as a plaintiff's actions are not responsible for the need for a second trial, the plaintiff may be compensated for time spent on both proceedings. *See O'Rourke v. City of Provi-*

*dence*, 235 F.3d 713, 737 (1st Cir. 2001); *Gierlinger v. Gleason*, 160 F.3d 858, 878-81 (2d Cir. 1998).

*Gierlinger*, a § 1983 case against a New York State Police Officer, involved three trials. The first trial ended in a jury verdict for the plaintiff, but the Second Circuit reversed and remanded that case for a new trial because it was "not possible to determine from the [jury] instructions whether the jury found [the defendant] liable on the theory of *respondeat superior*, which is not available in a § 1983 claim." *Gierlinger v. N.Y. St. Police*, 15 F.3d 32, 34 (2d Cir. 1994). The second trial, for reasons discussed below, ended in a mistrial. And the third trial ended with a verdict for the plaintiff. In its ruling on attorney's fees following the third trial, the district court denied the plaintiff attorney's fees for the first two trials, reasoning that the plaintiff bore significant responsibility for the errors that voided those trials.

The Second Circuit reversed, awarding plaintiff attorney's fees for all the trials. *Gierlinger*, 160 F.3d at 881. A close analysis of the Second Circuit's reasoning, however, suggests that had the plaintiff been responsible for the errors that voided the first two trials, compensation for attorney's fees for those trials would not have been appropriate. For instance, in its ruling as to the award of fees for the first trial, the Second Circuit, focusing on the reasonableness of the plaintiff's actions in that trial, noted that

> if [the plaintiff] had proposed erroneous jury instructions, or if she had opposed correct instructions . . . there would be a strong basis for denying her fees for some, if not all, of the hours her attorney expended on [the first trial]. But the record shows just the opposite . . . when the court asked whether [the plaintiff] objected to the addition of a specific instruction that there could be no liability on a *respondeat superior* theory, her attorney answered in the negative . . .

*Gierlinger*, 160 F.3d at 881. Similar reasoning is evident in the court's ruling that the plaintiff could receive fees for the second trial. The district court had ruled that the plaintiff should not receive attorney's fees for the second trial because the plaintiff had caused the mistrial when she, along with her attorney, gave an interview about the case to a reporter. In reversing this ruling, the Second Circuit found that "the record belies the district court's rationale that [plaintiff's attorney] bore significant responsibility for the mistrial." *Id*. at 878. Rather, the Second Circuit noted that the district court in granting the mistrial had specifically stated on the record that "the publicity in and of itself wouldn't justify declaring a mistrial," but other problems, not attributable to the plaintiff, did warrant a mistrial. *Id*. (quoting the district judge at the second trial).

Therefore, the Second Circuit reasoned that the plaintiff could receive attorney's fees for both the first and second trial because the plaintiff had not been responsible for the errors that voided those trials. *Id*. at 881. The First Circuit has agreed with the Second Circuit, finding that when a plaintiff prevails at a second trial, he or she may receive attorney's fees for both trials so long as the mistake that made the second trial necessary is not attributable to the plaintiff. *O'Rourke*, 235 F.3d at 737.

In the case at bar, the district court, in its ruling on attorney's fees, held that Shott was not responsible for the errors of the first trial and therefore could receive attorney's fees for that trial. In that ruling (on attorney's fees), the district court stated that it had granted a new trial because the verdict was against the weight of the evidence, not because of any errors committed by the plaintiff. We find that the record does not support this ruling.

First, and most importantly, the district court, in its order granting a new trial, stated that Shott pursued an unreasonable strategy that prejudiced Rush such that the verdict had to be set aside:

> While the court believes that there is some evidence in the record that could support the jury's verdict on the disability claim, it concludes that Rush was prejudiced by the way this case was tried and is entitled to a new trial. Plaintiff's strategy was to throw at the jury approximately 18 months of alleged misconduct by Dr. Preisler and leave it to the jury to sort out his motivation. Under some circumstances this would be a reasonable strategy, but in this case, because Dr. Shott brought her need for an accommodation to Dr. Preisler's attention so late in the sequence of events, there is substantial likelihood that the jury considered against Rush on the disability claim conduct that preceded any attempt at the good faith interactive process the law requires.

(R. 150 at 20.) From this statement, it appears that the district court actually was unsure that the verdict was against the weight of the evidence ("there is some evidence in the record that could support the jury's verdict"), but was sure that Rush was prejudiced by Shott's presentation of her case—a presentation that the district court found unreasonable. So, in contrast to the situation we faced in *Jaffee II*—where we held that the district court erred because it *refused to award* attorney's fees for the first trial even though it had found the plaintiff's strategy at that trial to be *reasonable*, *see Jaffee II*, 142 F.3d at 411—here the district court *awarded* attorney's fees even though it had found the plaintiff's strategy at the first trial to be *unreasonable*.

Second, Shott opposed jury instructions that may well have alleviated the errors of the first trial. In the first trial, the district court was concerned that the jury would hold Rush responsible for failing to accommodate Shott's disability based on events that occurred before Shott ever requested an accommodation. Rush had requested an instruction (Jury Instruction No. 23) that addressed this concern:

> For purposes of Dr. Shott's disability claims, you are directed to focus on events that occurred after May 27, 1994, the date she first requested an accommodation for her disability.

In its attorney's fee ruling, in finding that Shott had not been responsible for the failure to instruct the jury on this point, the district court laid blame upon itself for "not adequately guid[ing] the jury's consideration of the temporally overlapping discrimination claims in light of the requirement that defendant's duty to accommodate did not arise until plaintiff brought her need for an accommodation to the defendant's attention." (R. 216 at 4.) In its new trial order, however, the district court stated that its failure to instruct the jury properly was in fact the result of Shott's arguments against such instruction:

> The court rejected [Instruction 23] based on plaintiff's argument that her disability was obvious to everyone prior to [the day on which Dr. Preisler was advised of Shott's disability]. But reviewing all the evidence, it is clear that while her disability may have been obvious, her need for an accommodation was not obvious.

(R. 150 at 21.) Again, the reasons given by the district court for granting a new trial in the attorney's fee ruling do not follow the reasons given in its new trial order. Furthermore, we note that this situation, where a plaintiff unreasonably opposed a proper jury instruction that might have cured the errors of the trial, is almost identical to the situation that the Second Circuit opined would present "a strong basis for denying her fees for some, if not all, of the hours her attorney expended on [the first trial]." *Gierlinger*, 160 F.3d at 881.

Shott acknowledges that she opposed Jury Instruction No. 23, specifically the "focus on" language, but she maintains that she did agree that the court could instruct the jury that May 27, 1994, was the first date that she requested an accommodation for her disability. Our reading of the record

of the jury instruction conference, however, indicates that it is far from clear that Shott would have agreed to such an instruction. Furthermore, in its new trial order the district court explicitly noted that it was the "focus on" language in the instruction offered by Rush, that, if given, would have properly guided the jury:

> [T]he likelihood of prejudice to Rush was compounded by the court's failure to give an instruction, such as Rush's proposed instruction no. 23, which would have focused the jury's attention on the chronology critical to evaluating the failure to accommodate claim.

(R. 150 at 21.)

Therefore, we conclude that Shott should not receive attorney's fees or costs for the first trial. As noted above, Shott's presentation of the evidence in a way that confused the jury and her opposition to jury instructions that may have alleviated some of the confusion—along with the district court's specific finding that a second trial was necessary because of Shott's unreasonable strategy—leads us to this conclusion. We simply do not think it appropriate to award a litigant attorney's fees for a trial that was voided by her unreasonable strategy.

In sum, on remand the district court should not award attorney's fees or costs for the work performed by Shott's attorneys during the first trial. We see no problem, however, with awarding fees for the work done in preparation for that trial because it is likely that this work benefitted the second trial as well.[1]

---

[1] We acknowledge that the second trial involved only the ADA claim, as opposed to the first, which involved four claims; therefore, it is possible that some of the preparation for the first trial did not benefit the second, but we find that the district court's prior reduction of the fees by one-third based on degree of success adequately addresses this issue.

**B. Rush's Settlement Offer**

Rush next argues that we should further reduce the attorney's fee award based on a settlement offer made very early in this litigation, which Shott rejected.

In *Moriarty v. Svec*, we held that in determining the appropriate attorney's fee award the district court should consider whether substantial settlement offers were rejected by the party claiming attorney's fees. 233 F.3d 955, 967 (7th Cir. 2000). We reasoned that "[a]ttorney's fees accumulated after a party rejects a substantial offer provide minimal benefit to the prevailing party" and thus may not warrant being included in the fee award as a "reasonable attorney's fee." *Id*. We held that an offer was substantial, and therefore must be considered, if "the offered amount appears to be roughly equal to or more than the total damages recovered by the prevailing party." *Id*.

We must then determine if Rush's settlement offer was substantial; that is, whether the total damages Shott received by going to trial exceed the offered amount. Rush's offer came in March 1995, roughly five months after this litigation began. Under the terms of the offer, Rush would move Shott from her position at the Cancer Institute to a new position in the Department of Neurosurgery at no loss in rank. Rush also agreed that for the remainder of that academic year, which ended June 30, 1995, Shott would continue to receive the same salary, $62,400, in the Department of Neurosurgery that she did at the Cancer Institute. Rush's offer did not include any payment for damages, attorney's fees, or costs. And Rush conditioned the offer on Shott's signing a statement that read: "As part of a settlement in this case, I retract the statements made in the complaint and accept a position as Associate Professor of Neurosurgery." (R. 212, Ex. 1 at ¶ 7.) By rejecting this offer, Shott proceeded to trial and ultimately won a judgement of $60,000.

We find that this settlement offer was not substantial because the actual value of Rush's offer to transfer Shott to the Department of Neurosurgery at no cut in pay for the remainder of the academic year was somewhat illusory. On July 11, 1995, roughly three months after Shott rejected the settlement offer, Rush removed her from her position at the Cancer Institute, placed her in the previously offered position in the Department of Neurosurgery, and cut her salary to $48,548. According to the Chair of Rush's Department of Medicine, Dr. Stuart Levin, Shott's salary was cut because, in this new position, her responsibilities, workload, and administrative duties were reduced. If she had accepted Rush's settlement, she would have been transferred to the same position in Neurosurgery as early as March 1995, but would have received her former salary only until the end of academic year, which concluded on June 30, 1995. After the academic year ended, Rush would have been under no further obligation to continue paying Shott at her former salary, and given Dr. Levin's testimony, Rush would have likely cut her salary to $48,548 to reflect her new position's diminished responsibility, workload, and administrative duties. Therefore, by rejecting the offer, Shott was certainly no worse off than she would have been had she accepted the offer; in fact, she received 11 days more pay at her former salary by not accepting the offer and received a $60,000 damage award at trial.

Rush argues, however, that when the tax consequences of the attorney's fee award are considered, Shott actually would have been better off accepting its offer of basically nothing rather than going to trial and winning a $60,000 judgment but incurring a huge tax bill. According to Rush, Shott's attorney's fee award will likely be subject to the Alternative Minimum Tax ("AMT"). 26 U.S.C. § 55 (2003). The AMT applies if the total tax calculated under the AMT's guidelines exceeds the regular tax liability. Rush contends that Shott will likely be subject to the AMT

because while the fee award must be included in taxable income under both the AMT and the regular tax, it is deductible only for regular tax purposes because "it is one of a long list of expenses ('miscellaneous expenses') that are not deductible from gross income in computing the alternative minimum tax." *Kenseth v. Comm'r*, 259 F.3d 881, 882 (7th Cir. 2001). Using Shott's 2002 salary of $48,548, Rush calculates that under the AMT Shott's federal income tax liability on the fee award would be $125,644—more than enough to swallow her $60,000 damage award. Therefore, according to Rush, we should find that Shott would have been better off accepting its meager settlement award than winning and incurring a large bill from the IRS.

An overriding problem with Rush's argument is that none of the information upon which it relies in purporting to calculate Shott's tax liability is in the record. Even if we accepted Rush's premise that tax consequences should be considered, because Shott's tax information is not a matter of record in the case, we could not accurately calculate Shott's tax liability to determine whether it will leave her worse off. Therefore, we cannot say with any assurance that Shott's tax liability will exceed the damage award.

Furthermore, though we need not decide this issue now, we doubt that it would be appropriate for this court to establish a precedent wherein attorneys would be required to know the tax status of their clients before accepting or rejecting a settlement offer or wherein courts would routinely have to delve into the tax records of the parties to determine an appropriate fee award. As we noted in *Ustrak v. Fairman*, 851 F.2d 983, 987 (7th Cir. 1988), fee litigation already places a "heavy burden" on the federal courts; adding a requirement to calculate the tax status of the parties would only increase that burden.

Finally, even if it were possible to determine that Rush's settlement offer was substantial under the *Moriarty*

framework, we still would find no abuse of discretion here. In *Moriarty*, we cautioned that settlement offers are only one of many considerations to be made in awarding fees and thus district courts were only required to consider whether an attorney's fee award should be reduced based on the plaintiff's rejection of a substantial settlement offer; they are not necessarily required to reduce the fee award in every case. *Moriarty*, 233 F.2d at 967. Our review of the record satisfies us that the district court in this case adequately considered whether the fee award should be reduced based on the settlement offer and reasonably decided that it should not because the offer required Shott to recant all of the accusations in her complaint as part of the settlement. We, therefore, find no abuse of discretion in the district court's decision not to reduce the fee award on the basis of the settlement offer.

## C.  Prejudgment Interest

In *Missouri v. Jenkins*, the Supreme Court determined that a "reasonable attorney's fee," as provided for under § 1988, should include an enhancement for delay in payment. 491 U.S. 274, 283-84 (1989). The Court concluded that in order to ensure that attorney's fee awards reflected the market, such an enhancement was necessary because when compensation is received "years after the services were rendered . . . [it] is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings." *Id*. at 283.

In recognizing and applying this principle, we have noted that a court may compensate for delay in one of two ways: (i) it may award fees based on the attorney's rates at the time of the award (the "current rate" method) or (ii) it may award fees based on the attorney's rates at the time the services were rendered and add prejudgment interest on

that amount (the "historical rate plus interest" method). *See In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 571 (7th Cir. 1992). We have also stated that the historical-rate-plus-interest method is probably the most accurate and straight-forward. *Id.*

The district court in this case found that Shott was entitled to an enhancement for delay and used the historical-rate-plus-interest method to calculate that enhancement. Our review of a district court's decision to award prejudgment interest is for abuse of discretion. *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 572 (7th Cir. 2003). We note also that there is a presumption in favor of awarding prejudgment interest. *See In re Milwaukee Cheese Wis., Inc.*, 112 F.3d 845, 849 (7th Cir. 1997) ("[A district court's] [d]iscretion must be exercised according to law, which means that prejudgment interest should be awarded unless there is a sound reason not to do so."); *Gorenstein Enter., Inc. v. Quality Care—U.S.A., Inc.*, 874 F.2d 431, 436 (7th Cir. 1989) ("The time has come, we think, to generalize, and to announce a rule that prejudgment interest should be presumptively available to victims of federal law violations. Without it, compensation of the plaintiff is incomplete and the defendant has an incentive to delay."). In other words, in most cases prejudgment interest is an element of full compensation. *Id.* at 436.

Rush argues that our decision in *People Who Care v. Rockford Bd. of Educ.*, 272 F.3d 936 (7th Cir. 2001), is controlling and precludes an award of prejudgment interest in this case. In *People Who Care*, the prevailing plaintiffs sought an interim attorney's fee award in 1999 for services performed in 1997. *Id.* at 937. The district court awarded the fees and prejudgment interest on those fees. *Id.* at 937-38. The defendants appealed the award of prejudgment interest, and we reversed and remanded, holding that prejudgment interest was not appropriate. *Id.* at 938.

Several facts, however, distinguish *People Who Care* from the case at bar. First, the plaintiffs in *People Who Care* sought prejudgment interest on an interim fee award; whereas, here, Shott seeks prejudgment interest on a final fee award. The distinction is not without some importance because, as the Supreme Court noted in *Missouri v. Jenkins*, interim fee awards and prejudgment interest often serve the same purpose of accounting for the delay in compensation that long litigation often causes. 491 U.S. at 284 n.6 ("We note also that we have recognized the availability of interim fee awards under § 1988 when a litigant becomes a prevailing party on one issue in the course of the litigation. In economic terms, such an interim award does not differ from an enhancement for delay in payment.").

Second, and more importantly, *People Who Care* was an unusual situation in that the plaintiff was responsible for the delay in the receipt of its own attorney's fees because it did not bill the defendant for the services rendered in 1997 until 1999.[2] *People Who Care*, 272 F.3d at 938. Consequently, it would have been inappropriate to provide the plaintiff with an enhancement for delay when the plaintiff caused the delay. *See In re Milwaukee Cheese Wis., Inc.*, 112 F.3d at 849 ("Gratuitous delay by the party seeking the award—delay that injures the other side by forcing it to act as an uncompensated trustee or investment manager—might be a reason to limit an award of inter-

---

[2] *People Who Care* was also unusual because it was an institutional reform case that was in the remediation stage. Plaintiff's counsel had previously sought and obtained compensation for its work related to the implementation of the remedy. In 1996 and again in 1998, the district court issued orders directing the plaintiff to submit to the defendant monthly statements setting out the work done and amounts owed. Plaintiffs did not provide these monthly statements between 1997 and 1999, opting instead to submit only one fee request in 1999 for the entire period.

est."). As we noted, such an award would not reflect the market in any reasonable way: "Imagine the response of a client in the market who received a bill more than a year after the rendition of the services covered by it and was told that he owed not only the amount of the bill but compound interest for every month but one since the services were rendered." *People Who Care*, 272 F.3d at 938. In reality, the plaintiff in *People Who Care* sought prejudgment interest not as compensation for delay but simply as a matter of course. *Id.*

Finally, in *People Who Care*, the district court had awarded prejudgment interest accruing from the 30th day after the services were *rendered*. We noted that the calculation of interest should reflect the prevailing market and that such a billing scheme "obviously" would not exist in the market for legal services: "Lawyers rarely bill their clients within days of rendering services in an ongoing suit, receive payment within thirty days of that rendition, or charge interest for payment after thirty days." *Id.* (citations omitted). Unlike *People Who Care*, the district judge in this case determined that the prejudgment interest should begin to accrue thirty days after the client was billed for the service. We have no doubt that this is a much more reasonable reflection of how attorneys bill their clients in the market. Indeed, several district courts in the Northern District of Illinois have adopted this general method of calculating prejudgment as the best reflection of the market. *See, e.g., Eirhart v. Libbey-Owens-Ford Co.*, 774 F. Supp. 454, 456 (N.D. Ill. 1991); *Lippo v. Mobil Oil Corp.*, 692 F. Supp. 826, 842 (N.D. Ill. 1988).

In this case, the district court properly awarded prejudgment interest to compensate for the delay in payment. Rush makes no claim that Shott caused the delay in the way that the plaintiff in *People Who Care* had, and we are persuaded that the district court here used a much more sensible method of calculating prejudgment interest than was used

by the district court in *People Who Care*. Thus, we find that the district court did not abuse its discretion in awarding prejudgment interest. Such an award was necessary to ensure full compensation.[3]

### III.  Conclusion

In sum, we find that the district court did not abuse its discretion in refusing to reduce the attorney's fees award based on the rejection of a settlement offer early in the litigation, nor do we find an abuse of discretion in awarding of prejudgment interest. As to these two issues, the ruling of the district court is AFFIRMED. We, however, also conclude that Shott should not receive attorney's fees and costs for the first trial, although she may be compensated for work done in preparation for that trial. The district court's grant of attorney's fees for the first trial is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

A true Copy:

       Teste:

 

                                    _____
                                 *Clerk of the United States Court of*
                                     *Appeals for the Seventh Circuit*

---

[3]  It is possible that the amount of prejudgment interest may need to be recalculated on remand to account for our decision not to allow attorney's fees for the first trial, but we will leave that calculation to the district court's discretion.

---