28 A.3d 75

CONGRESSIONAL HOTEL CORPORATION

v.

MERVIS DIAMOND CORPORATION.

No. 1980, Sept. Term, 2009.

Court of Special Appeals of Maryland.

Sept. 2, 2011.

490

Jeffrey M. Orenstein (Goren, Wolff & Orenstein LLC, on the brief), Rockville, MD, for appellant.

Thomas F. Murphy (Robert E. Greenberg, Friedlander Misler PLLC, on the brief), Washington, D.C., for appellee.

Panel: KRAUSER, C.J., GRAEFF and RAYMOND G. THIEME, JR. (Retired, Specially Assigned), JJ.

KRAUSER, C.J.

Congressional Hotel Corporation ("CHC") appeals from an order of the Circuit Court for Montgomery County, awarding attorneys' fees and costs to Mervis Diamond Corporation ("Mervis"), pursuant to a provision of the parties' lease agreement (the "Lease"), for two bench trials and the first of two previous appeals,[1] resulting from CHC's breach of the parties' lease. The circuit court erred, CHC contends, by including, in that award, attorneys' fees and costs relating to Mervis's motion to reconsider, filed in this Court, following the first appeal and attorneys' fees and costs relating to the second trial when it was, according to CHC, Mervis's "errors and misconduct" that created the need for that trial. We disagree and affirm.

**Background**

This is the third time that this case has been before us. In outlining the factual basis of this appeal, we need proceed no further than to recite the facts and circumstances, as set out in our opinion in CHC's first appeal, *Congressional Hotel Corp. v. Mervis Diamond Corp.*, No. 1848, Sept. Term 2006 (filed December 12, 2007) (*"Congressional I "*), as we did in our opinion in CHC's second appeal, *Congressional Hotel Corp. v. Mervis Diamond Corp.*, No. 1075, Sept. Term 2009, slip op. at 5 (filed June 17, 2010) (*"Congressional II "*). They are:

On July 6, 2004, Mervis and CHC executed the Lease for approximately 3,282 square feet of retail space (the "Premises"). The Premises are attached to a Ramada Inn Hotel in the Congressional Village shopping center in Rockville.

---

1. As we shall explain in more detail later on, there were actually two prior appeals in this matter, but the award that is the subject of the instant appeal did not include fees or costs associated with the second appeal.

Under Section 1.02(j) of the Lease, Mervis was required to take possession of the Premises "five (5) days after Tenant's receipt of Landlord's notice to Tenant that the Premises [are] ready for Tenant's use and that Landlord has completed the work listed on Exhibit B (the 'Landlord's Work')." It is estimated, in Section 1.01(q) of the Lease, that CHC would deliver Notice of Possession by February 1, 2005.

* * *

... Prior to performing the Landlord's Work, CHC was required to obtain a building permit from the City of Rockville.

Section 2.04 of the Lease describes certain rights of CHC and Mervis related to CHC's failure to deliver Notice of Possession by the Estimated Delivery Date of February 1, 2005. . . .

* * *

Beginning in 2002, Congressional Village was being converted from a strip retail shopping center with surface parking into a mixed-use residential and commercial center with two elevated parking garages (Garages 1 & 2). . . .

The City of Rockville requested a plan ... for the development and construction of Congressional Village to ensure that adequate parking was maintained. . . . [The City] informed the involved parties that adequate parking would have to be maintained in order to obtain occupancy permits.

Garage 2, which was scheduled to be completed by mid-February of 2005, would provide retail parking for the retail tenants of Congressional Village and the Ramada Inn, including the Premises. During construction, Ronald Cohen[, a principal in CHC,] made a decision to delay the construction of Garage 2 and, instead, commence construction of [a building] in Congressional Village, which two of Congressional Village's largest and most prominent tenants were to occupy. [The City] approved the deviation.

In December of 2004, when it was clear that ... Garage 2 [would not be completed] by mid-February, 2005, CHC

began to explore the possibility of razing the Ramada Inn and constructing high-rise condominiums in its place. At a meeting in January of 2005, CHC informed Mervis that it wished to terminate the Lease and, instead, build condominiums at Congressional Village. CHC presented Mervis with architectural renderings of the project and offered Mervis the opportunity to purchase retail space. Mervis declined the offer and insisted on CHC's adherence to the Lease. CHC tried a second time, in the same month, to terminate the Lease. Mervis rejected that proposal as well.

\* \* \*

On the Estimated Delivery Date of February 1, 2005, CHC had not yet obtained the required building permit from the City of Rockville to commence the Landlord's Work. It received the permit on February 15, 2005, after Mervis and CHC had finalized the terms of the Landlord's work.

On February 18, 2005, counsel for Mervis sent a letter to CHC, asking when CHC planned to commence the Landlord's Work. CHC asked Mervis to meet and discuss its concerns, but Mervis declined. On March 1, 2005, counsel for Mervis sent a second letter, demanding information about CHC's plans to commence the Landlord's Work. When it did not hear from CHC, Mervis filed this action in the circuit court fifteen days later.

\* \* \*

Mervis alleged that CHC had breached the Lease and requested specific performance and lost profit damages. Mervis also sought a preliminary injunction to prevent CHC from altering or razing the Premises.

*Congressional I,* No. 1848, Sept. Term 2006, slip op. at 3–10 (footnotes omitted).

The first trial of this matter, a bench trial, began on June 12, 2006, and ended, six days later, on June 16, 2006. The circuit court, on September 29, 2006, issued a memorandum opinion and order (the "2006 Lost–Profits Judgment"), finding that CHC had breached the Lease "in early-March, 2005";

ordering specific performance of the Lease, as Mervis request-
ed; and awarding $2,164,500, representing lost profits from
March 15, 2005, to September 29, 2006, together with, as yet,
undetermined attorneys' fees and costs.

CHC thereafter noted its first appeal (*Congressional I*).
While CHC's appeal was pending, Mervis moved, in accor-
dance with the court's award of unspecified attorneys' fees and
costs, for an award of fees and costs for the first trial,
reserving the right to petition for an additional award "should
there be further litigation." On December 19, 2006, the circuit
court entered an order awarding Mervis $298,979.98 in attor-
neys' fees and costs, consisting of fees and costs incurred up to
and including the first trial (the "2006 Fee Award").

Following that award, we issued our unreported opinion in
*Congressional I*, vacating the 2006 Lost–Profits Judgment and
holding that the circuit court had erred in calculating Mervis's
lost profits, by starting from the date that the "Landlord's
Work" was to have commenced, because it was "the failure to
*complete* the Landlord's Work, not the failure to *commence*
that work, that constitute[d] the breach." *Congressional I*,
No. 1848, Sept. Term 2006, slip op. at 18 (emphasis in origi-
nal). Accordingly, we remanded the case for the circuit court
to determine when that work should have been completed,
leaving it to that court to determine "[w]hether a 'mini-trial' to
determine such issues [was] necessary." *Id.*

We also agreed with CHC that the circuit court made
certain evidentiary errors as to testimony relating to the
calculation of Mervis's lost profits, specifically in admitting
opinion testimony by a lay witness, Melvin Brenner, and in
allowing Ronald Mervis, an officer of Mervis, to "utilize a
Blackberry during his testimony, without making the informa-
tion on which he was relying available to the other side." *Id.*
at 41, 46–48. But we rejected CHC's three other claims,
namely, that Mervis's claim for lost-profit damages was barred
by the terms of the Lease and by Mervis's failure to mitigate
damages, that certain of Mervis's claims were also barred by
estoppel, and that the circuit court erred in concluding that

CHC was not entitled to terminate the Lease. *Id.* at 26, 30–31, 49, 53. When Mervis filed a motion for reconsideration, we denied that motion.

Before the case was retried in the circuit court, CHC undertook and completed, in four months, the Landlord's Work. Mervis accepted possession of the Premises on April 16, 2007; completed work of its own; and opened its store on October 15, 2007.

At the second trial, which spanned six days, from March 30, 2009 through April 6, 2009, both parties presented expert testimony as to the date that CHC should have completed the Landlord's Work and the amount of profits that Mervis lost as a result of the delay in opening its store. On April 22, 2009, the circuit court issued a memorandum opinion, finding that "CHC should have completed the Landlord's Work in sixty days" and that Mervis was therefore entitled to damages for lost profits during the two-year period from October 15, 2005, the date Mervis would have opened its store had CHC's work been finished in sixty days, and October 15, 2007, the date Mervis actually opened its store. Then, on July 10, 2009, the circuit court entered judgment, awarding Mervis a total of $3,456,085.50 in lost profits and prejudgment interest (the "2009 Lost–Profits Judgment").

From that judgment, CHC noted an appeal, asserting, first, that the 2009 Lost–Profits Judgment was based on improper expert witness testimony and, second, that Mervis was not the appropriate plaintiff because the losses, if any, were actually suffered by another independent corporate entity.[2] On June 17, 2010, in a second unreported opinion involving the two

---

2. CHC contended, at the second trial and on appeal from that trial, that Rockville Pike LLC, and not Mervis, was the intended beneficiary of the lease with CHC, because it was the entity that was to operate the new diamond store that was to be opened on the Premises. The circuit court disagreed, as did we, concluding that Mervis was the "entity which sustained the damages incurred during the period of time when the store would have been open, absent a breach of contract, and when it in fact opened." *Congressional II*, No. 1075, Sept. Term 2009, slip op. at 13–14.

parties, we affirmed the judgment of the circuit court. *Congressional II,* No. 1075, Sept. Term 2009, slip op. at 5.

Meanwhile, on July 6, 2009, after prevailing in the circuit court at the second trial, Mervis moved for a "supplemental judgment in the amount of $501,530.49" (the "2009 Fee Request"). In the 2009 Fee Request, Mervis sought attorneys' fees and costs for the period extending from the 2006 Fee Award through the second trial in April of 2009. That is, Mervis sought attorneys' fees and costs for the *Congressional I* appeal, the motion for reconsideration of this Court's decision in *Congressional I,* and the second trial, up to when the court issued its opinion following that trial. In its request, Mervis stated that it intended to move for an additional judgment of attorneys' fees and costs for any post-trial motions and appeals relating to the second trial.

Although CHC did not oppose the attorneys' fees and costs claimed by Mervis for the *Congressional I* appeal, it did oppose the attorneys' fees and costs claimed by Mervis for the trial and appellate proceedings that followed the *Congressional I* decision, specifically, Mervis's motion for reconsideration of that decision and the second trial. That is, CHC claimed that Mervis was not entitled to $323,875.68 of the requested $501,530.49 because those fees and costs, CHC asserted, "should never have been incurred and would never have been incurred but for the errors [Mervis] committed in the first trial."

Two months later, on September 15, 2009, the circuit court held a hearing on Mervis's 2009 Fee Request. In a memorandum opinion and order, dated September 21, 2009, the circuit court found "the fees charged and the costs incurred in connection with the second trial to be fair, reasonable, and necessary," explaining that

although the Court of Special Appeals held it was error for the first trial court to use "early March 2005" as the commencement of the damages period, such an error was not the product of an unreasonable position taken by Mervis.

Furthermore, the second trial did not substantially dupli- cate the first trial—the mini-trial on CHC's completion of the Landlord's Work was held only once, at the ... second trial. The second trial bore little resemblance to the first trial, due in large measure to the new strategies employed by CHC on remand.

(Emphasis in original; footnotes omitted.)

The circuit court then awarded Mervis the $501,530.49 it requested in attorneys' fees and costs (the "2009 Fee Award"). CHC now appeals from that order, but, as it did at the hearing below, contests only the $323,875.68 in fees and costs incurred by Mervis following *Congressional I.*

**Discussion**

Section 25.01 of the Lease provides that "if either party hereto finds it necessary to employ legal counsel or to bring an action at law or other proceedings against the other party to enforce any of the terms, covenants or conditions hereof, the unsuccessful party shall pay to the prevailing party a reasonable sum for attorneys' fees." Those fees "include attorneys' fees on *any* appeal." (Emphasis supplied.) Section 25.01 further provides that the prevailing party is also "enti- tled to all other reasonable costs for investigating such action, taking depositions and the discovery, travel, and all other necessary costs incurred in such litigation."

There is no dispute that Section 25.01 is valid and enforce- able and that Mervis was ultimately the "prevailing party"[3] in the underlying litigation. Nor is there any disagreement over the rates charged, or the number of hours claimed, by Mer- vis's attorneys.

What CHC does claim, however, is that "the time [Mervis] expended in the preparation of its motion for reconsideration

---

**3.** "In the context of an award of attorney's fees, a litigant is a 'prevail- ing party' if he succeeds 'on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.' " *Royal Inv. Group, LLC v. Wang,* 183 Md.App. 406, 457, 961 A.2d 665 (2008) (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)).

[of our decision in *Congressional I* ] and all of the time expended by [Mervis] on the post-remand portion of this case was 'excessive, redundant, and/or unnecessary' " because "the errors that led to the [s]econd [t]rial were all calculated and/or strategic acts of" Mervis at the first trial. It was, asserts CHC, "unreasonable" for Mervis, first, to "refus[e] to use an expert" to prove how long the Landlord's Work should have taken; second, to "try to cloak its expert's testimony in the clothing of lay testimony"; and, third, to "[s]end[ ] its witness, Ronald Mervis, to the stand with[,] and to testify from[,] an unauthorized electronic device that contained hearsay evidence."[4] CHC asks us to vacate the circuit court's judgment and limit the award of attorneys' fees and costs to either "amounts unrelated to the [s]econd [t]rial or, in the alternative, the first trial."

In awarding "fees based on a contract entered by the parties authorizing an award of fees," a court should, the Court of Appeals instructs, "use the factors set forth in Rule 1.5[of the Maryland Lawyers' Rules of Professional Conduct] as the foundation for analysis of what constitutes a reasonable fee." *Monmouth Meadows Homeowners Ass'n v. Hamilton,* 416 Md. 325, 336–37, 7 A.3d 1 (2010). Those factors are:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

---

4. Mervis has filed, in this Court, a motion to strike a portion of CHC's brief in which, according to Mervis, CHC makes "improper and unjustified allegations ... that imply that Mervis' counsel was guilty of misconduct" for "sending" Ronald Mervis to the stand with an unauthorized electronic device. In response, CHC has filed a line apologizing to this Court and "especially" to Mervis's counsel, clarifying that it "did not intend to argue ... that [Mervis's] counsel advised Mr. Mervis to undertake these acts" and that it "is confident that [Mervis's] counsel would never have provided such direction." In light of this clarification by CHC's counsel, we understand CHC's assertion to be that the errors of the first trial were attributable to Mervis, the party, and not that Mervis's counsel engaged in any intentional misconduct. We therefore see no need to strike the contested portion of CHC's brief.

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

*Id.* at 336 n. 10, 7 A.3d 1 (quoting Md. Lawyers' R. Prof'l Conduct 1.5(a)).

In awarding attorneys' fees based on a contractual fee and cost shifting provision, a trial court "may consider, in its discretion, any other factor reasonably related to a fair award of attorneys' fees" and "should consider the amount of the fee award in relation to the principal amount in litigation." *Id.* at 337–38, 7 A.3d 1. But, in so doing, the court need not "explicitly comment on or make findings with respect to each factor." *Id.* at 337 n. 11, 7 A.3d 1. In fact, the court, in making its award, need not even "mention Rule 1.5 as long as it utilizes the rule as its guiding principle in determining reasonableness." *Id.* at 340 n. 13, 7 A.3d 1. And, finally, the trial court's determination of the reasonableness of attorneys' fees "is a factual determination within the sound discretion of the court, and will not be overturned unless clearly erroneous." *Royal Inv. Group, LLC v. Wang,* 183 Md.App. 406, 456, 961 A.2d 665 (2008) (citing *Nova Research, Inc. v. Penske Truck Leasing Co.,* 405 Md. 435, 448 n. 4, 952 A.2d 275 (2008); *Holzman v. Fiola Blum, Inc.,* 125 Md.App. 602, 637, 726 A.2d 818 (1999)).

In its calculation of attorneys' fees and costs, the circuit court reviewed "the fee and cost submissions" of Mervis's counsel, which included "detailed invoices . . . along with the

affidavit of Robert E. Greenberg, Esq., [Mervis's] lead trial counsel." Although it was not required to "explicitly comment on or make findings with respect to" each factor in Rule 1.5(a) of the Maryland Lawyers' Rules of Professional Conduct, or, indeed, even mention the rule, *see Monmouth*, 416 Md. at 338 n. 11, 340 n. 13, 7 A.3d 1, the court below expressly stated that the attorneys' fees and costs requested would be denied if they did not "comport with Rule 1.5."

Applying the factors in that rule, the circuit court found that the attorneys' fees and costs Mervis incurred in the second trial were "fair, reasonable, and necessary." As to the factors relating to "the time and labor required, the novelty and difficulty of the questions involved . . . the skill requisite to perform legal services properly," and "the time limitations imposed," the court, professing to be "intimately familiar with the amount of work required" in the case, found that the case "presented many novel and difficult questions of law, procedural and substantive," and that "[c]ounsel for all parties performed at the highest level of the profession." As to the factor relating to "the amount involved and the results obtained," the court observed that the "stakes for both sides were enormous." The attorneys' fees and costs in the two awards, which amounted to $800,510.47, were not out of line with the "enormous" stakes of the underlying litigation or the results obtained by Mervis's attorneys, specifically a judgment ordering specific performance of the Lease and awarding $3,456,085.50 in lost profits and prejudgment interest.

Moreover, as to CHC's contention that the fees and costs incurred in the second trial were "excessive, redundant, and/or unnecessary," the circuit court specifically pointed out that "the second trial did not substantially duplicate the first trial" but, in fact, "bore little resemblance to the first trial, due in large measure to the new strategies employed by CHC on remand." It further found that, as a result of our remand in *Congressional I*, CHC received, and took advantage of, "the chance to present new, different, improved, better, novel . . . things [it] never thought about the first time." And when the circuit court prevented Mervis from using, at the second trial,

a "key concession" made by CHC's damages expert at the first trial, CHC was able to advance, the circuit court pointed out, "a damages theory altogether different from, and in certain respect[s] inconsistent with, the damages theory previously espoused." Furthermore, at the second trial, CHC employed, as the circuit court put it, a "scorched earth" strategy; "[y]ou name it, it was raised repeatedly."

CHC insists, however, that, when a party's conduct at one trial necessitates an appeal and a subsequent trial, that party, though it may ultimately prevail, should be denied attorneys' fees and costs for the second trial. In support of that proposition, CHC principally relies, as it did below, on a number of federal cases involving fee-shifting statutes, asserting that courts have "generally concluded that if the need for further proceedings was caused by positions advocated by or mistakes of the prevailing party, such acts may justify denying compensation in the second proceeding." It claims that, in the instant case, the attorneys' fees and costs requested by Mervis were incurred "solely as a result of [Mervis's] own strategic and evidentiary errors prior to and at the first trial."

As we shall see, CHC misstates the holdings of those cases, which actually stand for the proposition that otherwise reasonable attorneys' fees and costs for subsequent proceedings may be denied to the prevailing party when the trial court, in its discretion, determines that the prevailing party's *unreasonable* conduct at the first trial created the need for the subsequent proceedings. We nonetheless accept CHC's invitation to examine several statutory fee-shifting cases, since this Court is not aware of any Maryland or federal case addressing when. attorneys' fees and costs may be awarded for successive trials and appellate proceedings under a contractual fee-shifting provision.[5]

---

5. Though cited by neither party, we feel compelled to briefly address *Long v. Burson*, 182 Md.App. 1, 30, 957 A.2d 173 (2008), where we suggested that plaintiffs who had prevailed in a foreclosure proceeding relating to certain property might not be entitled to attorneys' fees and costs, under a contract, for an earlier unsuccessful declaratory judgment action against the same defendants as to the same property. But,

Before so doing, we acknowledge that there are material differences between how statutory and contractual fee-shifting claims are to be assessed. But those differences are few in number when compared with the similarities the two approaches share. Thus, statutory fee-shifting cases provide some assistance in resolving the dispute before us.

In a statutory fee-shifting case, courts generally employ the "lodestar method" in calculating what attorneys' fees and costs are to be awarded. *Monmouth*, 416 Md. at 333–34, 7 A.3d 1. That method "begins by multiplying the number of hours reasonably spent pursuing a legal matter by a 'reasonable hourly rate' for the type of work performed." *Id.* (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), *abrogated in part on other grounds by Gisbrecht v. Barnhart*, 535 U.S. 789, 122 S.Ct. 1817, 152 L.Ed.2d 996 (2002)); *Manor Country Club v. Flaa*, 387 Md. 297, 320, 874 A.2d 1020 (2005). That figure is then adjusted by the court, by applying twelve non-exclusive factors. *Monmouth*, 416 Md. at 333, 7 A.3d 1. Those factors, as approved by the Supreme Court and, in turn, embraced by the Court of Appeals are:

(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

---

unlike the instant case, the proceedings in *Long*, we said, ran "parallel" to each other. *Id.* at 9, 957 A.2d 173. That is, although there were multiple trials relating to the same dispute, the later proceeding, at which the plaintiff prevailed, did not arise as a result of the earlier proceedings. *Long* is thus distinguishable from the instant case, which involves successive, not parallel, proceedings.

*Monmouth,* 416 Md. at 334, 7 A.3d 1 (citing *Blanchard v. Bergeron,* 489 U.S. 87, 91 n. 5, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989); *Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974)).

Fee-shifting statutes, the Court of Appeals has explained, " 'are usually designed to encourage suits that, in the judgment of the legislature, will further public policy goals.' " *Monmouth,* 416 Md. at 334, 7 A.3d 1 (quoting *State v. Native Village of Nunapitchuk,* 156 P.3d 389, 403 (Alaska 2007)). That is why the lodestar method includes such factors as the "undesirability" of the case (factor 10) and its public impact (factor 8) [6] and, when appropriate, may lead to the approval of a fee award that "may very well ... [be] larger than the amount in controversy." *See id.*

■■■ In contrast to the twelve factors of the lodestar method used in statutory fee-shifting cases, the courts in contractual fee-shifting cases apply the eight non-exclusive factors set out in Rule 1.5. *Monmouth,* 416 Md. at 336, 7 A.3d 1. Those factors are:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

---

**6.** *See Friolo v. Frankel,* 373 Md. 501, 522 n. 2, 819 A.2d 354 (2003) (citing *Johnson,* 488 F.2d at 718).

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

*Id.* at 336 n. 10, 7 A.3d 1 (quoting Md. Lawyers' R. Prof'l Conduct 1.5(a)).

A contractual fee-shifting provision is designed by the parties, not by the legislature. Such a provision is simply an agreement between private parties to pay the attorneys' fees and costs reasonably incurred in the course of litigation. Thus, it usually serves no larger public purpose than the interests of the parties. And, therefore, while an award of attorneys' fees and costs in a contractual fee-shifting case "may approach or even exceed the amount at issue," the "relative size of the award" takes on added significance in such a case because the contractual provision lacks the "public policy underpinnings" of a statutory fee-shifting provision. *Monmouth,* 416 Md. at 337, 7 A.3d 1.

Despite the policy differences underlying the two approaches, they have many features in common; as our highest court has observed, the factors in Rule 1.5 are "identical or similar" to the factors in the lodestar method. *Friolo v. Frankel,* 373 Md. 501, 527, 819 A.2d 354 (2003). In fact, the difference in the number of factors, twelve in the lodestar method versus eight in Rule 1.5, is due, in large part, to the fact that the first factor of Rule 1.5 includes the first three factors of the lodestar method. After that, the only remaining difference between the two approaches is that the lodestar method includes an "awards in similar cases" factor and an "undesirability of the case" factor, which Rule 1.5 does not.

Because of the factorial overlap of the two approaches, the statutory fee-shifting cases provide helpful guidance in our analysis of the circumstances under which a party's conduct at one trial may justify the denial of attorneys' fees and costs in subsequent proceedings.

Citing *Shott v. Rush–Presbyterian–St. Luke's Medical Center,* 338 F.3d 736 (7th Cir.2003); *O'Rourke v. City of Providence,* 235 F.3d 713 (1st Cir.2001); *Gierlinger v. Gleason,* 160

F.3d 858 (2d Cir.1998); and *Meeks v. State Farm Mutual Automobile Insurance Company,* 460 F.2d 776 (5th Cir.1972), CHC contends that "if the need for further proceedings was caused by positions advocated by or mistakes of the prevailing party, such acts may justify denying compensation in the second proceeding."

Of those cases, *Shott* is "particularly instructive," CHC claims. But the reasoning of the federal appellate court, in that case, actually undermines CHC's position. In *Shott,* the plaintiff sued her employer, alleging, among other things, religious and disability discrimination. 338 F.3d at 738. At the first trial, the jury found for the plaintiff on the disability discrimination claim. *Id.* But the district court did not permit that verdict to stand. Finding that the jury was prejudiced by the plaintiff's unreasonable strategy of "throw[ing] at the jury approximately 18 months of alleged misconduct by [the defendant] and leav[ing] it to the jury to sort out his motivation," the district court set aside the verdict and ordered a new trial. *Id.* at 741. Following a second trial, limited to the disability discrimination claim, the jury again found for the plaintiff, and the district court awarded, under a statutory fee-shifting provision, attorneys' fees and costs to the plaintiff for both trials. *Id.*

While leaving the award for the second trial intact, the Seventh Circuit reversed the award for the first trial. *Id.* at 742. Although it observed that "when two trials are required to achieve the ultimate result, a plaintiff should be compensated for both trials, so long as the time spent at both was reasonably expended," it noted that the court below had expressly found that the plaintiff's strategy at the first trial was "unreasonable" and, furthermore, that the plaintiff had opposed jury instructions that "may well have alleviated the errors of the first trial." *Id.* at 739, 741–42. Consequently, it "d[id] not think it appropriate to award [the plaintiff] attorney's fees for a trial that was voided by her *unreasonable* strategy." *Id.* at 742 (emphasis supplied).

In support of that conclusion, the *Shott* Court cited *Jaffee v. Redmond,* 142 F.3d 409 (7th Cir.1998) ("*Jaffee II* "), a statuto-

ry fee-shifting case involving multiple trials and one appeal. In that case, the defendants argued, at the first trial, that the principal defendant's communications with a psychotherapist, as reflected in the psychotherapist's notes, were privileged. *Jaffee II*, 142 F.3d at 411. The district court disagreed, and, although the psychotherapist's notes were never actually admitted, the jury was instructed that it could presume the contents were favorable to the defendants. *Id.* After a verdict for the plaintiff, the defendants appealed, and the Seventh Circuit reversed and remanded for a new trial, holding that the privilege invoked by the defendants should have been recognized. *Id.*

At the second trial in the *Jaffee* litigation, the plaintiff again prevailed, but the district court denied roughly half of her request for attorneys' fees and costs, specifically, most of the amount she requested for the appeal and the total amount she requested for the second trial. *Id.* at 412. Despite finding it "reasonable" for the plaintiff to "pursue the privilege issue" during the first trial, the district court denied her request for attorneys' fees and costs for arguing the privilege issue on appeal and for the second trial, which "was necessitated," the district court observed, by the plaintiff "having incorrectly argued against a privilege at the first trial." *Id.* at 412.

When the plaintiff appealed that denial, the Seventh Circuit reversed, stating:

> While an *unreasonable* argument that necessitates further proceedings may justify denying compensation for those proceedings, the district court in this case found that [the plaintiff] *acted reasonably* in arguing against the privilege.... In determining the extent to which such time is compensable, *a fee award is not automatically precluded because the second trial was "necessitated by" a reasonable but unsuccessful argument.*

*Id.* at 416 (emphasis supplied).

Thus, as summed up recently by the United States Court of Appeals for the Fifth Circuit: "Combined with the *Jaffee II* holding, *Shott* implies that if the plaintiff's unreasonable be-

havior did not cause the first trial verdict to be vacated, a plaintiff may receive attorneys' fees for the expenses incurred during a trial that was later vacated." *Abner v. Kan. City S. Ry. Co.*, 541 F.3d 372, 381–82 (5th Cir.2008). That is, those cases stand for the proposition that the appropriateness of an award for attorneys' fees and costs incurred in multiple trials depends on whether the subsequent trial was necessitated by "unreasonable" conduct by the prevailing party.

The three additional cases cited by CHC—*Gierlinger, O'Rourke* and *Meeks*—do nothing to change that standard. In both *Gierlinger* and *O'Rourke*, the district court denied attorneys' fees and costs to the prevailing party after incorrectly attributing the need for the subsequent proceedings to that party, and that error was corrected by the appellate court. *See Gierlinger*, 160 F.3d at 878–79 [7]; *O'Rourke*, 235 F.3d at 737.[8] In *Meeks*, the district court did not consider the reasonableness of the prevailing party's conduct at all.[9]

---

**7.** In *Gierlinger*, a statutory fee-shifting case, the ultimately prevailing plaintiff sought attorneys' fees and costs for the three trials and one appeal that had taken place in the case. 160 F.3d at 863. The district court denied the plaintiff's request as to the time spent on appeal and most of the time spent on the second and third trials, indicating it was doing so, in part, because the plaintiff "bore significant responsibility for the mistrial." *Id.* at 876, 878. The United States Court of Appeals for the Second Circuit reversed, holding that the district court had abused its discretion in denying the plaintiff attorneys' fees as neither the jury instruction, which necessitated the second trial, nor the mistrial, which necessitated the third, were the fault of the plaintiff. *Id.* 878–79.

**8.** In *O'Rourke*, another statutory fee-shifting case, the United States Court of Appeals for the First Circuit held that the district court had abused its discretion in denying the ultimately prevailing plaintiff's request for attorneys' fees and costs, for two trials, based upon the erroneous conclusion that the need for the second trial was caused by the plaintiff's "introduction of irrelevant and highly prejudicial evidence" at the first. 235 F.3d at 737. There was "no reason" to deny fees and costs to the plaintiff because, concluded the First Circuit, the second trial was necessitated, not by the plaintiff, but by the district court's erroneous legal ruling. *Id.* at 733, 737.

**9.** In *Meeks*, the Fifth Circuit reduced, by half, an award for attorneys' fees incurred in two trials, but did not state that it was doing so because

Thus, in none of the cases cited by CHC, did an appellate court reverse an award by a trial court, after the trial court had concluded, as the circuit court did here, that the prevailing party's conduct at the first trial was not unreasonable and that the total amount requested was "fair, reasonable, and necessary." Here, unlike in *Gierlinger, O'Rourke,* and *Meeks,* the circuit court expressly considered whether the strategy and conduct of Mervis, the prevailing party, was, at the first trial, unreasonable. Like the court in *Jaffee II,* the circuit court in the instant case found that it was not.

As set out above, the court conducted a complete and thoughtful analysis of the components and circumstances of Mervis's request for attorneys' fees and costs, and found that the amount requested was "fair, reasonable, and necessary," a finding that was not clearly erroneous. None of the cases cited by CHC suggest that we should disturb that finding. Nor does our analysis in *Congressional I* suggest such a result. Though this Court was not persuaded by Mervis's argument that the lost profits period used by the circuit court, at the first trial, was warranted, it did not find that position to be unreasonable. The proceedings that followed were not necessitated by any unreasonable conduct by Mervis, but by the erroneous rulings of the trial court as to the time period used to calculate lost profits and the admission of certain testimony relating to lost profits.

Finally, we note that CHC draws a distinction between the attorneys' fees Mervis incurred in "defending against CHC's appeal" in *Congressional I* and those Mervis incurred in seeking a reconsideration of our decision in that appeal, asserting that the latter should be disallowed. But CHC does not explain the reason for such a distinction, nor do we see

the behavior of the plaintiff was, at the first trial, "unreasonable." 460 F.2d at 780–81. In fact, neither the district court nor the federal appellate court addressed the reasonableness of the error that led to the second trial. *Id.* Moreover, *Meeks* was not even mentioned by the Fifth Circuit, thirty-six years later, when, in *Abner,* it embraced the analysis of the Seventh Circuit, in *Jaffee II* and *Shott. See Abner,* 541 F.3d at 381–82.

why Mervis should be entitled to attorneys' fees and costs for its reasonable, if ultimately unpersuasive, argument in defense of the trial court's judgment at one stage of the appellate proceedings, but not at another. Nor did the circuit court err in declining to draw such a distinction in awarding attorneys' fees and costs.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**